UNITED STATES, Appellee

v.

Christopher P. MARTINELLI, Specialist
U.S. Army, Appellant

No. 02-0623

Crim. App. No. 20000311

United States Court of Appeals for the Armed Forces

Argued April 13, 2004 and March 1, 2005

Decided September 28, 2005

ERDMANN, J., delivered the opinion of the court, in which EFFRON
and BAKER, JJ., joined.  GIERKE, C.J., filed a separate opinion
concurring in part and dissenting in part.  CRAWFORD, J., filed
a dissenting opinion.

Counsel

For Appellant:  Captain Charles A. Kuhfahl Jr. (argued); Colonel
Adele H. Odegard, Colonel Robert D. Teetsel, Lieutenant Colonel
Mark Tellitocci, Major Sean S. Park, Major Jeanette K. Stone,
and Captain Mary C. Vergona (on brief).

For Appellee:  Captain Janine P. Felsman and Captain Mason S.
Weiss (argued); Colonel Lauren B. Leeker, Colonel Steven T.
Salata, Lieutenant Colonel Margaret B. Baines, Lieutenant
Colonel Theresa A. Gallagher, and Lieutenant Colonel Mark L.
Johnson (on brief).

Military Judge:  Kenneth H. Clevenger

**This opinion is subject to revision before final publication.**

United States v. Martinelli, No. 02-0623/AR

Judge ERDMANN delivered the opinion of the court.

This case presents yet another issue arising from the prosecution of servicemembers for violating federal criminal statutes relating to child pornography in the wake of Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002).  Specialist Christopher Martinelli's convictions are based upon violations of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2252A (2000), the same statute that we addressed in United States v. O'Connor, 58 M.J. 450 (C.A.A.F. 2003), and in United States v. Mason, 60 M.J. 15 (C.A.A.F 2004).

Unlike the circumstances in O'Connor and Mason, however, the conduct underlying Martinelli's conviction occurred outside the United States -- specifically in Darmstadt, Germany.  We granted review of this case to examine the question of whether the CPPA applies to conduct engaged in outside the territorial boundaries of the United States when charged under clause 3 of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000).

We hold that the CPPA does not have extraterritorial application and therefore does not extend to Martinelli's conduct in Germany.  We further hold that Martinelli's conduct under Specification 1 occurred in both Germany and the United States and therefore falls within the domestic application of the CPPA.  We also hold that Martinelli's plea to Specification 1 was not

provident under O'Connor.  Finally, although we have held that

servicemembers can be prosecuted under clauses 1 and 2 of

Article 134 for offenses involving "virtual" children,

Martinelli's guilty pleas to the CPPA-based specifications

cannot be deemed provident to lesser included offenses under

clauses 1 and 2 under the principles discussed in Mason, 60 M.J.

at 18-20.

### PROCEDURAL BACKGROUND

Martinelli entered guilty pleas and was convicted by

general court-martial in April 2000 on four CPPA-based

specifications under clause 3 of Article 134, UCMJ (sending,

receiving, reproducing and possessing child pornography) and one

specification of obstructing justice in violation of Article

134, UCMJ.  He was sentenced by the military judge to a

dishonorable discharge, confinement for three years, forfeiture

of all pay and allowances and reduction to the lowest enlisted

grade.  In accordance with the terms of a pretrial agreement,

the convening authority reduced the confinement to eighteen

months, but approved the balance of the sentence.

Before the Army Court of Criminal Appeals, Martinelli

argued that his child pornography conviction must be reversed

because the statute underlying it was unconstitutionally vague

and overbroad.  Martinelli based this contention on a Ninth

Circuit decision that had been granted certiorari but not yet

United States v. Martinelli, No. 02-0623/AR

decided by the United States Supreme Court.  See Free Speech

Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999), cert. granted

sub nom. Ashcroft v. Free Speech Coalition, 531 U.S. 1124 (2001).

Prior to the Supreme Court issuing its decision, however, the

Court of Criminal Appeals reviewed Martinelli's case and

summarily affirmed his conviction and sentence.  United States v.

Martinelli, No. Army 20000311 (A. Ct. Crim. App. Feb. 7, 2002)

(unpublished).

Martinelli then petitioned this court for review of the

Court of Criminal Appeals decision.  By that time, the Supreme

Court had upheld the Ninth Circuit ruling upon which Martinelli

had based the challenge to his conviction.  See Ashcroft v. Free

Speech Coalition, 535 U.S. 234 (2002).  We granted review of

Martinelli's Issue I in which he challenged his CPPA-based

convictions under clause 3 of Article 134 in light of Free Speech

Coalition and we specified an issue addressing whether the CPPA

had extraterritorial application.[1]  Following argument on these

---

[1] On November 24, 2003 we granted review of the following issues:

    I.    WHETHER APPELLANT'S GUILTY PLEAS TO SPECIFICATIONS 1,
2, 3 AND 4 OF THE CHARGE WERE IMPROVIDENT BECAUSE THE
MILITARY JUDGE PROVIDED AN UNCONSTITUTIONALLY
OVERBROAD DEFINITION OF CHILD PORNOGRAPHY AND DID NOT
CONDUCT AN ADEQUATE PROVIDENCE INQUIRY, AS REQUIRED BY
UNITED STATES v. CARE, 18 U.S.C.M.A. 535, 40 C.M.R.
247 (1969), AND ITS PROGENY.

    II.   WHETHER 18 U.S.C. SECTIONS 2252A(a)(1)-(a)(3) AND
(a)(5)(A) APPLY TO CONDUCT ENGAGED IN OUTSIDE THE

initial issues,[2] the court ordered supplemental briefing on two additional issues related to the extraterritorial application of the CPPA.[3]  The case was reargued with inclusion of the two additional issues.

## FACTUAL BACKGROUND

Martinelli's CPPA convictions are grounded in four discrete actions that he took with respect to images of "child pornography."  Beginning in January 1999 and continuing through January 2000, Martinelli downloaded images of child pornography from the Internet using computers located at the off-post Netzwork Internet Café in Darmstadt, Germany.  He would search Internet websites and log into Internet chat rooms in order to communicate with individuals willing to send him images.  He

---

TERRITORIAL LIMITS OF THE UNITED STATES WHEN CHARGED UNDER CLAUSE 3 OF ARTICLE 134, UCMJ.

[2] We first heard oral argument in this case at the United States Coast Guard Academy, New London, Connecticut, as part of this court's "Project Outreach."  This practice was developed as part of a public awareness program to demonstrate the operation of a Federal Court of Appeals and the military justice system.

[3] On October 22, 2004 we granted the additional specified issues:

    III.    WHETHER 18 U.S.C. §§ 2252A(a)(1)–(a)(3) APPLY TO AN INDIVIDUAL WHO SENDS, RECEIVES, AND REPRODUCES ELECTRONIC FILES CONTAINING CHILD PORNOGRAPHY AT AN INTERNET CAFÉ LOCATED OFF POST IN GERMANY.

    IV.    WHETHER 18 U.S.C. §§ 2252A(a)(1)–(a)(3) ARE BEING APPLIED DOMESTICALLY OR EXTRATERRITORIALLY WHEN E-MAILS CONTAINING CHILD PORNOGTRAPHY ARE SENT THROUGH E-MAIL OR INTERNET SERVICE PROVIDER SERVERS LOCATED IN THE UNITED STATES.

would ultimately secure the images through one of two distinct routes:  (1) he would receive materials via electronic mail (e-mail) sent by other individuals to e-mail accounts that he maintained with either Yahoo! or Hotmail or (2) he would be directed by individuals to their respective web pages, from which Martinelli would secure the images directly.  Under either scenario, he would download the images from the e-mail attachments or web page contents to the hard drive of a computer at the Netzwork Café.  Martinelli received at least sixty-four images of child pornography in this fashion.

After receiving the images, Martinelli would copy them in order to distribute them to other individuals in the form of attachments to e-mail transmissions.  He transmitted some of these images to other individuals via his Yahoo! and Hotmail accounts, sending approximately twenty such messages over the relevant time period.

Martinelli also copied the images from the hard drives of the computers at the Netzwork Café to a separate disk, which he then took back to his barracks at the Cambrai Fritsch Kaserne, a United States Army installation in Darmstadt, Germany.  At the barracks he would either keep the images on the disk or load them onto the hard drive of his computer.

Martinelli was charged with the following violations of the CPPA under clause 3 of Article 134:

Specification 1: knowingly mailing, transporting or shipping child pornography in interstate or foreign commerce (by computer) in violation of § 2252A(a)(1) (specifically, sending images over the Internet from the Netzwork Internet Café in Darmstadt, Germany);

Specification 2: knowingly receiving child pornography that has been mailed, shipped or transported in interstate or foreign commerce (by computer) in violation of § 2252A(a)(2)(A) (specifically, downloading images from the Internet in the Netzwork Internet Café in Darmstadt, Germany);

Specification 3: knowingly reproducing child pornography for distribution through the mails, or in interstate or foreign commerce (by computer) in violation of § 2252A(a)(3) (specifically, downloading images from the Internet; copying them to hard drive and transmitting the copied files to approximately twenty individuals over the Internet in the Netzwork Internet Café in Darmstadt, Germany);

Specification 4: knowingly possessing child pornography on land and in a building used by and under the control of the United States Government in violation of § 2252A(a)(5)(A) (specifically, possessing approximately fifty diskettes containing child pornography in buildings at the Cambrai Fritsch Kaserne).

## DISCUSSION

A.    Standard of Review

This case involves a guilty plea. For this court to reject a guilty plea on appellate review, the record of trial must show a substantial basis in law and fact for questioning the plea. United States v. Jordan, 57 M.J. 236, 238 (C.A.A.F. 2002)(citing United States v. Prater, 32 M.J. 433, 436 (C.M.A. 1991)). Whether Congress intended the CPPA to have extraterritorial application is a question of statutory interpretation.

United States v. Martinelli, No. 02-0623/AR

Interpretation of a statute and its legislative history are questions of law that we review de novo. United States v. Falk, 50 M.J. 385, 390 (C.A.A.F. 1999).

   B.   The Nature of the Charge under Article 134

Martinelli's conduct was charged as a violation of Article 134, UCMJ -- the "General Article."  Conduct is punishable under Article 134 if it "prejudices good order and discipline in the armed forces" (clause 1), if it is "of a nature to bring discredit upon the armed forces" (clause 2), or if it is a crime or offense not capital (clause 3).  O'Connor, 58 M.J. at 452. As was the case in both O'Connor and Mason, Martinelli's conduct was specifically charged as a "clause 3" offense, with the CPPA serving as the "crime or offense not capital."

The initial question that we specified for review is ostensibly straightforward -- does the CPPA apply to Martinelli's conduct in Germany?  The President, in the Manual for Courts-Martial, has stated that:

> A person subject to the [UCMJ] may not be punished under
> clause 3 of Article 134 for an offense that occurred in a
> place where the law in question did not apply.  For
> example, a person may not be punished under clause 3 of
> Article 134 when the act occurred in a foreign country
> merely because that act would have been an offense under
> the United States Code had the act occurred in the United
> States.  Regardless where committed, such an act might be
> punishable under clauses 1 or 2 of Article 134.

Manual for Courts-Martial, United States (2002 ed.) (MCM), pt. IV, ¶ 60.c.(4)(c)(i) (emphasis added).  As a uniformed

8

servicemember stationed in Germany, Martinelli was unquestionably subject to the jurisdiction of the UCMJ. See Articles 2(a)(1) and 5, UCMJ, 10 U.S.C. §§ 802(a)(1), 805 (2000). There is also no question that the CPPA, if charged under clause 3 of Article 134, would be applicable to Martinelli's conduct had he engaged in these acts in an Internet cafe in Killeen, Texas and then carried the disks back to a barracks room on Fort Hood. Similarly, his conduct might well be punishable under clauses 1 and 2 of Article 134 regardless of where it occurred.

The question we address today is not the jurisdiction of the UCMJ itself, but rather whether the CPPA has extraterritorial application under clause 3 of Article 134.[4] If we find that the CPPA, as a "crime or offense not capital," is not applicable to Martinelli's conduct in Germany, we must then consider whether, due to the nature of his usage of the Internet, his conduct fell within the domestic application of the CPPA. To the extent that we find that Martinelli's conduct fell within the domestic application of the CPPA, we must then consider whether his guilty pleas were provident in light of O'Connor. Finally, if we find that Martinelli's pleas were

---

[4] The question of the extraterritorial application of federal statutes has nothing to do with the jurisdiction of the federal courts. It is a question of substantive law, which turns on the intent of Congress that a particular statute have

improvident under clause 3 of Article 134 for either reason, we must determine whether they would be provident to lesser included offenses under clauses 1 or 2 of Article 134.

C.   The Extraterritorial Application of the CPPA

(1)   Presumption Against Extraterritoriality

The extraterritorial application of Federal statutes does not involve any question as to Congress' authority to enforce its criminal laws beyond the territorial boundaries of the United States -- Congress clearly has that authority. United States v. Bowman, 260 U.S. 94, 98-103 (1922). Rather, the question here is whether Congress has in fact exercised that authority, which is a matter of statutory construction. Equal Employment Opportunity Commission v. Arabian American Oil Co. (Aramco), 499 U.S. 244, 248 (1991).

The Supreme Court has recognized as a longstanding principle of American law "'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" Id. (quoting Foley Bros. v. Filardo, 336 U.S. 281, 285 (1949)); see also Small v. United States, 125 S. Ct. 1752, 1755 (2005). We must assume that Congress legislates against the backdrop of the presumption against extraterritoriality. Aramco, 499 U.S. at 248. Unless the "affirmative intention" of Congress to give

extraterritorial application. See Hartford Fire Ins. Co. v.

extraterritorial effect to a statute is "clearly expressed," it is presumed that the statute is "primarily concerned with domestic conditions."  Id. (quoting Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 147 (1957) and Foley Bros., 336 U.S. at 285).

The presumption against extraterritoriality has been recognized in the specific context of criminal statutes, with an "exception" for a certain class of offenses:

> Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and fraud of all kinds, which affect the peace and good order of the community, must of course, be committed within the territorial jurisdiction of the government where it may properly exercise it.  If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. . . .
>
> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officer or agents.  Some such offenses can only be committed within the territorial jurisdiction of the Government because of the local acts required to constitute them.  Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home.  In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

California, 509 U.S. 764, 813 (1993) (Scalia, J., dissenting).

Bowman, 260 U.S. at 98. We have previously characterized Bowman as drawing a distinction between:

> (1) statutes punishing crimes against the peace and good order of the community (which apply only to [acts] committed within the territorial jurisdiction of the United States unless Congress had specifically directed otherwise); and (2) statutes punishing fraud or obstructions against the United States Government (which include by implication acts which were committed in foreign countries).

United States v. Gladue, 4 M.J. 1, 5 (C.M.A. 1977).

The principles articulated by the Supreme Court in Aramco and Bowman can be harmonized to provide the following analytical framework for assessing whether the CPPA was intended to have extraterritorial effect: Unless the CPPA can be viewed as falling within the second category described in Bowman ("criminal statutes which are, as a class, . . . enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated," 260 U.S. at 98), the statute is subject to the presumption against extraterritoriality recognized in both Bowman and Aramco.

We do not believe that the CPPA can be viewed as a "second category" offense under Bowman and thus exempt from application of the presumption against extraterritoriality. The ultimate objective behind the criminal proscription of activities pertaining to child pornography is to protect children from abuse. Free Speech Coalition, 535 U.S. at 245. While few

12

crimes are more serious or morally repugnant, child abuse does not involve "fraud" or "obstruction" against the United States Government.  Rather, child abuse epitomizes that class of "[c]rimes against private individuals [including children]" that "affect the peace and good order of the community" described in the first category of Bowman.  260 U.S. at 98.

We are aware of the body of law, primarily from the Ninth Circuit, that does not read the second category in Bowman as limited to crimes against the Government.  See, e.g., United States v. Vasquez-Velasco, 15 F.3d 833, 839 n.4 (9th Cir. 1993); United States v. Thomas, 893 F.2d 1066, 1068 (9th Cir. 1990).  Those cases all trace their roots, in one fashion or another, back to United States v. Baker, 609 F.2d 134, 136 (5th Cir. 1980), where the Fifth Circuit read Bowman as allowing a court, in the absence of any expression of congressional intent, to "infer" Congress' intent to provide for extraterritorial application "from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved."[5]

_____

[5] For a critical discussion of the roles of Congress, the Executive and the judiciary regarding the extraterritorial application of federal statutes, see Mark P. Gibney, The Extraterritorial Application of U.S. Law:  The Perversion of Democratic Governance, The Reversal of Institutional Roles, and the Imperative of Establishing Normative Principles, 19 B.C. Int'l & Comp. L. Rev. 297, 308 (1996).

The Baker court concluded that a federal statute prohibiting drug possession with intent to distribute fell within "the second category described in Bowman" and thus was intended to apply extraterritorially.  Id. at 137.

The holding in Baker has been subsequently used to support the "inference" of a congressional intent for extraterritorial application in several circumstances that do not involve crimes against the Government, including child pornography-related offenses.  See, e.g., United States v. Harvey, 2 F.3d 1318, 1327 (3d Cir. 1993)(sentencing guidelines for child pornography offenses); Thomas, 893 F.2d at 1068-69 (production of child pornography under 18 U.S.C. § 2251).  We disagree, however, with Baker's expanded view of the "second category" offenses in Bowman.  The phrase "inferred from the nature of the offense" in Bowman was clearly cast in reference to the "class" of criminal statutes involving fraud or obstruction against the Government and is not a free standing principle of statutory construction:

> But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. . . .  In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

14

260 U.S. at 98.[6]

Accordingly, we adhere to the view we originally expressed in Gladue. The only category of offenses exempt under the language of Bowman from any presumption against extraterritoriality and for which a congressional intent for extraterritorial application can be "inferred from the nature of the offense" are those involving "obstructions" and "frauds" against the Government. See United States v. Gatlin, 216 F.3d 207, 211 n.5 (2d Cir. 1999).

(2) Indicia of Congressional Intent

Our conclusion that the CPPA is subject to a presumption against extraterritoriality under Aramco and Bowman does not end our inquiry into its applicability. We now "look to see whether 'language in the [relevant statute] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control.'" Aramco, 499 U.S. at 248 (quoting Foley Bros., 336 U.S. at 285). In searching for the clear expression of congressional intent required by Aramco, we are not limited to the text of the statute and can "consider 'all available evidence' about the meaning of the statute, including its text,

---

[6] We also note that the Baker concept of "inferring" extraterritorial intent based on the nature of the offense and Congress' other efforts to eliminate the type of crime involved could apply to almost any crime committed anywhere in the world.

structure, and legislative history."  Gatlin, 216 F.3d at 212

(quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 177

(1993)).

### (a) Text and Structure

Our reading of the CPPA does not find any indication in the

text and structure of the statute of a congressional purpose to

extend its coverage.  See Bradley Scott Shannon, The

Jurisdictional Limits of Federal Criminal Child Pornography Law,

21 Hawaii L. Rev. 73, 106 (1999) (noting that the language of

the CPPA "do[es] not clearly express an intent" that the statute

is to apply extraterritorially).  The text and structure of the

statute prohibits five categories of conduct:

- mailing, transporting or shipping child pornography in interstate or foreign commerce by any means, including by computer (18 U.S.C. § 2252A(a)(1));

- receipt or distribution of child pornography that has been mailed, shipped or transported in interstate or foreign commerce by any means, including by computer (18 U.S.C. § 2252A(a)(2)(A), (B));

- reproduction of child pornography for distribution by mail or interstate or foreign commerce, including by computer (18 U.S.C. § 2252A(a)(3)(A));

- sale or possession with intent to sell of (1) child pornography that has moved in interstate or foreign commerce by any means, including by computer or was produced using materials that have moved in commerce or (2) any child pornography "in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United

---

This would turn the presumption against extraterritorial
application on its head where criminal statutes are involved.

> States Government, or in the Indian country (as defined in section 1151). . . . " (18 U.S.C. § 2252A(a)(4)(A), (B)); and
>
> • possession of (1) child pornography that has moved in interstate or foreign commerce by any means, including by computer or was produced using materials that have moved in commerce or (2) any child pornography "in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government, or in the Indian country (as defined in section 1151). . . ." (18 U.S.C. § 2252A(a)(5)(A), (B)).

The criminal acts in the first three subsections all refer to the movement of child pornography "in interstate or foreign commerce," whether it be the act of moving the material itself (§ 2252A(a)(1)) or the acts of receiving, distributing or reproducing for distribution materials that have moved in that fashion (§ 2252A(a)(2)-(3)).

The criminal acts in the final two subsections are sale, possession with intent to sell, and simple possession. Under these subsections, criminal liability can attach under either of two separate circumstances. The first involves the same "interstate or foreign commerce" context attendant to the offenses in § 2252A(a)(1)-(3). The second circumstance is purely dependent on physical location or the "situs" of the defendant -- if the requisite act occurs "in the special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to or otherwise used by or under the control of the United States Government," it does

17

not matter whether the child pornography ever moved in commerce. See § 2252A(a)(4)(A), (5)(A).

There are two aspects of the statutory language in § 2252A(a)(1)-(a)(5) that could possibly be read as expressing congressional intention as to extraterritorial effect -- (1) the references to "interstate or foreign commerce" and (2) the situs language in § 2252A(a)(4)(A), (a)(5)(A).  In terms of the former, they are not, in and of themselves, a "clear expression" of any congressional intention that the acts proscribed by the statute constitute a federal crime no matter where in the world they occur.  Rather, we view them as a straightforward reference to the source authority of Congress for proscribing these acts as criminal in the first instance, i.e., the Commerce Clause of the United States Constitution:

> Many Acts of Congress are based on the authority of that body to regulate commerce among the several States, and the parts of these Acts setting forth the basis for legislative jurisdiction will obviously refer to such commerce in one way or another.  If we were to permit possible, or even plausible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption.

Aramco, 499 U.S. at 253.  The use of the term "foreign commerce" in addition to "interstate commerce" does not alter that conclusion, as the Supreme Court "has repeatedly held" that even statutes that expressly refer to "foreign commerce" do not apply abroad.  Id. at 251.

United States v. Martinelli, No. 02-0623/AR

That leaves the situs language in §§ 2252A(a)(4)(A) and 2252A(a)(5)(A) as a possible basis for overcoming the presumption against extraterritoriality. There are three alternative locations referenced in the statute:

- "the special maritime and territorial jurisdiction of the United States"; or

- "any land or building owned by, leased to, or otherwise used by or under the control of the United States Government"; or

- "the Indian country" (as defined in 18 U.S.C. § 1151).

The reference to Indian country reflects a congressional focus on complex jurisdictional issues that flow from the unique, and inherently domestic, relationship between the United States Government and American Indians. It certainly does not reflect any clear legislative concern for matters arising outside the territorial boundaries of the United States.

The term "special maritime and territorial jurisdiction of the United States" is, like "Indian country," a term of art that carries its own distinct definition. See 18 U.S.C. § 7 (2000). That term of art has been the subject of different interpretations as to its extraterritorial reach, particularly whether it extends to lands within the territory of a sovereign foreign nation. See, e.g., United States v. Corey, 232 F.3d 1166, 1183 (9th Cir. 2000)(term includes property inside Yokota

19

Air Base in Japan and private apartment building rented by United States embassy in Philippines); Gatlin, 216 F.3d at 220 (term does not include housing complex on U.S. Army base in Darmstadt, Germany).

We conclude that the depth and complexity of the debate reflected in Corey and Gatlin inherently demonstrates something less than a "clear expression" of congressional intention that the term "special maritime and territorial jurisdiction of the United States" extends to lands inside the boundaries of a foreign nation. Further, Congress has since acted to resolve the specific subject of the debate in Corey and Gatlin, which was narrowly focused on the reach of certain federal criminal statutes to conduct engaged in overseas by civilians employed by or accompanying the armed forces. See Military Extraterritorial Jurisdiction Act of 2000, Pub. L. No. 106-523, 114 Stat. 2488 (codified at 18 U.S.C. § 3261) (MEJA). Congress used MEJA to create a new federal criminal offense involving conduct engaged in "outside the United States" that would otherwise constitute a felony if the conduct had been engaged in "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 3261 (a) (2000).[7]

---

[7] See also Glen R. Schmitt, Closing the Gap in Criminal Jurisdiction Over Civilians Accompanying the Armed Forces Abroad -- A First Person Account of the Creation of the Military Extraterritorial Jurisdiction Act of 2000, 51 Cath. U. L. Rev. 55, 78, 113-14 (2001).

The remaining situs language refers to conduct occurring "on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government." That language undoubtedly reflects a congressional intent to criminally proscribe conduct in physical locations where the United States Government enjoys some type of proprietary control over the location. The language, however, does not provide clear evidence of a congressional intent that the statute should apply outside the boundaries of the United States. That language could just as easily apply only to land and buildings located within the territorial United States such as national parks, federal office buildings and domestic military installations.

We also note that the language concerning "land or building" does not stand alone, but is instead bracketed by language dealing with the "special maritime and territorial jurisdiction of the United States" and "the Indian country (as defined in section 1151)." Under the canon of statutory construction noscitur a sociis (a word is known by the company it keeps), it is reasonable to conclude that Congress intended the "land or building" language to have the same domestic application as evidenced in the surrounding language. See Amgen Inc. v. Smith, 357 F.3d 103, 112-13 (D.C. Cir. 2004) (applying the canon of noscitur a sociis to support consistent

21

interpretation of separate phrases within a statutory section); In re Application of the United States for an Order Authorizing the Roving Interception of Oral Communications, 349 F.3d 1132, 1142-43 (9th Cir. 2003) (using the canon of noscitur a sociis to interpret a section of the federal wiretapping statute); see also United States v. Hicks, 6 C.M.A. 621, 623, 20 C.M.R. 337, 339 (1956).

We do not view the statutory phrases discussed above, either individually or collectively, as the type of "clear expression" of congressional intention required by Aramco. The analysis dictated by Bowman and Aramco requires that the statutory text reflect a clear expression of Congress' intent that the statute have extraterritorial reach. Aramco, 499 U.S. at 248. The language must be clear enough to overcome a presumption that it was intended to apply domestically, not simply lend itself to a plausible argument that it applies overseas. Mere plausibility is not sufficient to overcome the presumption. Id. In the context of that presumption, we do not view the "any land or building" language of §§ 2252A(a)(4)(A) and 2252A(a)(5)(A) as a "clear expression" by Congress that it have extraterritorial application.

(b) Legislative History

Having concluded that the text and structure of the CPPA do not express any clear intent by Congress that the statute apply

extraterritorially, we reach the same conclusion with respect to its legislative history.  The clear focus of that legislative history is on the patent evils of child pornography and the new dimension that computer technology adds to those evils.  See Congressional Findings, notes following 18 U.S.C.A. § 2251, 18 U.S.C.S. 2251.  Although the history contains extensive discussion of those issues, it is devoid of any reference to issues of extraterritoriality, much less any clear expression of congressional intent in that regard.  See S. Rep. No. 104-358, at 12-23 (1996).

(c)  Examples of Clear Congressional Intent

Our conclusion regarding the absence of any clearly expressed intent by Congress that the CPPA apply extraterritorially is bolstered by the numerous instances where such intent has been clearly expressed.  Even in the specific context of child pornography, Congress knows how to makes its intention clear that a particular criminal statute extend to conduct engaged in outside the United States.  See, e.g., 18 U.S.C. § 2260(b)("a person who, outside the United States, knowingly receives, transports, . . . any visual depiction of a minor engaging in sexually explicit conduct . . . intending that the visual depiction will be imported into the United States"); 18 U.S.C. § 2251(c)(1)("[a]ny person who . . . employs, uses, . . . any minor to engage in, or who has a minor assist any other

person to engage in, any sexually explicit conduct outside of the United States").

Congress has clearly expressed its intent in other criminal statutes as well:  the Biological Weapons Anti-Terrorism Act of 1989 provides, "There is extraterritorial federal jurisdiction over an offense under this section committed by or against a national of the United States," 18 U.S.C. § 175(a) (2000); the Maritime Drug Law Enforcement Act provides, "This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States."  46 U.S.C. app. § 1903(h) (2000).

Congress also amended 18 U.S.C. § 7 (2000), which defines the "special maritime and territorial jurisdiction" of the United States, as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107-56, 115 Stat. 272 (2001).  The USA PATRIOT Act amendments inserted a new provision that, with respect to "offenses committed by or against a national of the United States," extends the special maritime and territorial jurisdiction of the United States under 18 U.S.C. § 7 to the "premises of . . . diplomatic, consular, military or other . . missions . . in foreign States. . . ."  USA PATRIOT Act § 804 (codified at 18 U.S.C. § 7(9)(A)).  This is a clear expression of congressional

24

intent that a crime committed in "the special maritime and territorial jurisdiction" now includes conduct that may in some instances have occurred inside the boundaries of a foreign nation.

Finally, we note Congress' ability to make its intentions in this regard clear with respect to a broad range of criminal acts rather than a single crime. In legislation proscribing "[a]cts of terrorism transcending national boundaries," Congress has provided that the statute extends to "conduct occurring outside of the United States in addition to conduct occurring inside of the United States" and that "[t]here is extraterritorial Federal jurisdiction" over the wide range of offenses described in the statute. See 18 U.S.C. § 2332(e), (g)(1) (2000). These examples of express congressional intent constitute various indicia, none of which are present with respect to the CPPA.

To reach the conclusion urged by the Government, that Congress intended the CPPA to criminalize conduct inside the boundaries of sovereign foreign countries,[8] we would have to

---

[8] Unless restricted by Congress, a statute with a clear congressional intent of extraterritorial effect, applies to foreign nationals as well as United States nationals. Such an interpretation raises international law concerns. See United States v. Delgado-Garcia, 374 F.3d 1337, 1344-45 (D.C. Cir. 2004); see also id. at 1351-62 (Rogers, J., dissenting); Restatement (Third) of Foreign Relations Law of the United States §§ 401-03 (1987).

disregard the <u>Bowman</u> and <u>Aramco</u> presumption and the absence of these indicia. The rules of statutory construction laid down by the Supreme Court simply do not support that conclusion.

Accordingly, we cannot view the CPPA as overcoming the presumption against extraterritorial application dictated by <u>Bowman</u> and <u>Aramco</u>. The charges against Martinelli fall squarely within the example the President described in the <u>Manual for Courts-Martial</u>, i.e., "a person may not be punished under clause 3 of Article 134 when the act occurred in a foreign country merely because that act would have been an offense under the United States Code had the act occurred in the United States." <u>MCM</u>, pt. IV, ¶ 60.c.(4)(c)(i). As a result, there is a substantial basis in law and fact for viewing Martinelli's guilty pleas to the CPPA-based clause 3 offenses under Article 134 for conduct occurring in Germany as improvident.

D. <u>The Domestic Application of the CPPA</u>

Martinelli stipulated that all of the e-mails that he sent or received at his Yahoo! or Hotmail e-mail accounts were electronically routed through the servers in the United States.[9] This connection to the United States raises the possibility that the CPPA could be applied domestically to the three

---

[9] We address only those instances where e-mails were routed through Martinelli's U.S.-based e-mail accounts. Martinelli did not stipulate, nor is there any evidence on the record, that he utilized U.S.-based servers when he downloaded child pornography

specifications that were based upon e-mail messages sent or received through Martinelli's e-mail accounts.[10]  Martinelli argues that in each specification, the charge sheet alleges that the conduct occurred only "at or near Darmstadt, Germany" and therefore the Government put him on notice that the misconduct occurred in Germany.  He argues that the situs of the offenses was in Germany and the fact that the material may have been routed through an Internet server located in the United States does not transform what was an extraterritorial act into a domestic act.

The Government responds that there was more than one situs for Martinelli's misconduct and that the prosecution was proper under either a domestic or extraterritorial application of the CPPA.  The Government contends that because the Internet server was located in the United States and due to the continuing nature of the offenses involved (sending, receiving, and reproducing child pornography) a part of each offense was committed in the United States.  Therefore the Government argues that a domestic application of the CPPA is proper.  The Government cites United States v. Moncini, 882 F.2d 401 (9th Cir. 1989), in support of its position.

---

directly from websites and we therefore do not address that issue.

[10] Specification 4 is the situs based possession charge and the specification did not allege movement through the Internet.

<u>United States v. Martinelli</u>, No. 02-0623/AR

In <u>Moncini</u>, a citizen and resident of Italy was arrested as he entered the United States and was tried in the United States District Court for the Central District of California for mailing child pornography from Italy to an undercover officer in California in violation of 18 U.S.C. § 2252. <u>Moncini</u>, 882 F.2d at 403. Prior to his trial Moncini filed a motion to dismiss the indictment for lack of personal jurisdiction. The trial court denied his motion on the ground that the mailings were "continuing offenses which continued to take place as Moncini's letters traveled from Italy to California, giving the court territorial jurisdiction." <u>Id.</u> The trial court found, in the alternative, that extraterritorial jurisdiction would be proper. <u>Id.</u>

Moncini was convicted and on appeal he again urged a lack of jurisdiction. The Ninth Circuit affirmed the lower court's decision explaining that "[j]urisdiction is proper if the offense, or part of the offense, occurred within the United States." <u>Id.</u> (citing <u>Rocha v. United States</u>, 288 F.2d 545, 547 (9th Cir. 1961)). The court went on to explain that "Moncini's mailing of child pornography was a continuing offense, so that part of the offense was committed in the United States as his letters traveled through the mail and were delivered to their destination." <u>Id.</u> The court "reject[ed] Moncini's argument that the crime was complete at the time the letter was deposited

28

in the mail in Italy." Id. The Ninth Circuit did not reach the question of extraterritoriality.

The obvious distinction between Moncini and this case is that in this case the child pornography flowed through the Internet rather than through the mails. The statute, however, is not limited to "mail" but includes "mail, transport or ship" and as such includes material routed through the Internet. It can not be disputed that for purposes of sending and receiving communications, the Internet e-mail system is rapidly becoming the 21st century equivalent of the 20th century postal system. The domestic application of the CPPA is therefore possible under the "continuing offense" theory for Specifications 1–3. As each specification alleges different misconduct, each must be examined individually.

Specification 1 (sending): This specification charged that Martinelli used "electronic mail to send electronic files containing child pornography through the Internet". We agree with the Ninth Circuit that "sending" child pornography is a continuing offense that continues as the e-mail travels through the Internet to its destination. In this case those travels included a routing through servers located in the United States. As a result, a domestic application of the CPPA to Specification 1 is appropriate. Moncini, 882 F.2d at 403.

Specification 2 (receiving):  This specification charged that Martinelli received "child pornography that had been . . . transported . . . by means of a computer to wit:  downloading electronic files containing child pornography from the Internet."  Unlike the "sending" specification, Martinelli's acts of receiving the child pornography were not the start of any conduct that continued into the United States.  His conduct in "receiving" the e-mails occurred in Germany only and there can be no domestic application of the CPPA to this specification.[11]

Specification 3 (reproducing):  This specification charged that Martinelli "reproduced by means of a computer child pornography for distribution . . . by downloading from the

---

[11] With respect to the question of whether all of the e-mail messages in Martinelli's Yahoo! and Hotmail accounts were "resident" on Internet servers located in the United States, both Yahoo! and Hotmail (which is operated by MSN, a division of Microsoft Corp.) have significant international operations.  See Yahoo! 2004 Annual Report, available at http://yhoo.client.shareholder.com/annual.cfm (follow "2004 Annual Report" hyperlink) (listing office locations in thirty-three cities around the world and noting that:  "Our principal Web server equipment and operations are maintained in California and several other domestic and international locations."); Microsoft Fiscal Year 2004 Form 10-K, available at http://www.microsoft.com/msft/sec.mspx (follow "Fiscal Year 2004 Form 10-K" hyperlink) (listing a European Operations Center in Dublin, Ireland and noting that:  "Our facilities are fully used for current operations of all segments. . . .").  Martinelli stipulated only that his e-mail messages had been routed through servers located in the United States.  The record does not include any information about the servers on which his opened and unopened e-mail messages were stored.

Internet electronic files . . . copying said files to computer diskettes and sending the copied files . . . by electronic mail."[12]  Similar to the "receipt" specification, in reproducing for distribution, Martinelli commenced no conduct that continued into the United States and there can be no domestic application of the CPPA.

In summary, we find that while Specification 1 involves conduct that continued into the United States and therefore provides for the domestic application of the CPPA, Specifications 2 and 3 involve conduct that is not continuing in nature and do not provide for the domestic application of the CPPA.

E.   The Providence of Martinelli's Guilty Plea to Specification 1

Having determined that the CPPA is domestically applicable to Specification 1, and therefore finding no basis to question Martinelli's plea to Specification 1 on extraterritoriality grounds, we must now determine whether Martinelli's guilty plea to that specification was provident under O'Connor, 58 M.J. at 453-40.

(1)  The Providence Inquiry and Record of Trial

Under Specification 1, Martinelli was charged with violation of the CPPA as a "crime or offense not capital" under

---

[12] "Sending" is not an element of this offense, rather the offense is "reproducing for distribution" and the "sending"

clause 3 of Article 134.  The military judge explained to

Martinelli that clause 3 of Article 134 prohibits the commission

of crimes and offenses not capital and that he had been charged

with violation of 18 U.S.C. § 2252A.  The military judge went on

to explain the elements of knowingly and wrongfully mailing,

transporting or shipping child pornography by using electronic

mail to send electronic files containing child pornography

through the Internet, which Martinelli acknowledged he

understood.  The military judge then read Martinelli the

definition of several terms that were used in 18 U.S.C. § 2252A,

including the definition of child pornography, which the

military judge noted was found in 18 U.S.C. § 2256.  The

military judge defined "child pornography" as follows:

> [A]ny visual depiction, including any photograph, film,
> video, picture, or computer, or computer-generated image or
> picture, whether made or produced by electronic,
> mechanical, or other means of sexually explicit conduct,
> where:
>
> (A)  the production of such visual depiction involves the
>      use of a minor engaging in sexually explicit conduct;
>
> (B)  such visual depiction is, or appears to be, of a minor
>      engaging in sexually explicit conduct;
>
> (C)  such visual depiction has been created, adapted, or
>      modified to appear that an identifiable minor is
>      engaging in sexually explicit conduct; or
>
> (D)  such visual depiction is advertised, promoted,
>      presented, described, or distributed in such a manner
>      that conveys the impression that the material is or
>      contains a visual depiction of a minor engaged in
>      sexually explicit conduct.

allegation was included to meet the "distribution" element.

The military judge did not inquire as to whether Martinelli believed that his conduct was either prejudicial to good order and discipline or service discrediting. As in O'Connor, the military judge's use of the pre-Free Speech Coalition definition of "child pornography" properly reflected the law at the time of trial. His failure to inquire into the "actual" or "virtual" distinction or discuss the possible "service discrediting" or "prejudicial to good order and discipline" characteristics was perfectly understandable. O'Connor, 58 M.J. at 453.

(2) The Providence of the Plea Under Clause 3

In O'Connor this court reviewed a guilty plea to a clause 3 Article 134 CPPA offense in light of the Supreme Court's decision in Free Speech Coalition:

> In Free Speech Coalition, the Supreme Court determined that certain portions of the § 2256(8) definition are unconstitutional, specifically the "or appears to be" language of § 2256(8)(B), and the entirety of § 2256(8)(D). 535 U.S. at 256, 258. In striking the former, the Court specifically discussed the distinction between "virtual" child pornography and "actual" pornography and concluded that the rationales for restricting pornographic materials involving actual children do not extend to computer-generated simulations or images. Id. at 249-56.
>
> The Supreme Court concluded that the First Amendment prohibits any prosecution under the CPPA based on "virtual" child pornography.
>
> . . . .
>
> Prior to Free Speech Coalition, knowing possession and receipt of images of child pornography, virtual or actual, was sufficient to establish one of the factual predicates

33

for a plea of guilty under the CPPA. The "virtual" or "actual" character of the images was not, in and of itself, a factual predicate to a guilty plea -- criminal liability could arise under either circumstance. . . . In the wake of Free Speech Coalition, the relevant provisions of 18 U.S.C. § 2256(8) require that the visual depiction be of an actual minor engaging in sexually explicit conduct. The "actual" character of the visual depictions is now a factual predicate to any plea of guilty under the CPPA.

58 M.J. at 452-53 (internal footnote omitted).

Similar to the situation in O'Connor, the definition used by the military judge in this case included those portions of the definition later struck down by the Supreme Court in Free Speech Coalition. The military judge did not discuss those aspects of the CPPA that were not affected by the Supreme Court's ruling, i.e., "actual" child pornography under 18 U.S.C. § 2256(8)(A), (B) or "computer morphed" images of an identifiable minor under § 2256(8)(C). O'Connor, 58 M.J. at 452. As we noted in Mason:

Under our decision in O'Connor, a provident guilty plea to a violation of the CPPA must reflect that the accused violated those portions of the statute not affected by the Supreme Court's ruling in Free Speech Coalition. 58 M.J. at 454. The absence of any focus on or discussion concerning those aspects of the statute in the present record coupled with the use of the unconstitutionally overbroad definition during Mason's plea colloquy render this case indistinguishable from O'Connor.

60 M.J. at 18.

Similarly, and for the same reasons, the absence of any focus on the "actual" versus "virtual" nature of the images, the use of the unconstitutional definition of "child pornography,"

34

and the absence of anything in the record that would demonstrate that Martinelli pled guilty to a constitutionally defined violation of federal law, we find Martinelli's guilty plea to Specification 1 improvident.

F.    The Possibility of Lesser Included Offenses

The improvidence of Martinelli's pleas under clause 3 does not end our inquiry -- an improvident plea to a CPPA-based clause 3 offense may, under certain circumstances, be upheld as a provident plea to a lesser included offense under clauses 1 or 2 of Article 134.  Mason, 60 M.J. at 18-19; O'Connor, 58 M.J. at 454.  The only question is whether those circumstances are present in Martinelli's case.[13]

The nature of the defects in Martinelli's clause 3 pleas in regard to Specification 1 and in regard to Specifications 2, 3 and 4 are different.  In Specification 1 the defect, similar to O'Connor and Mason, involved the impact of the Supreme Court's

---

[13] This court ruled, in United States v. James, 55 M.J. 297 (C.A.A.F. 2001), that the CPPA was constitutional as applied to images of "virtual" children.  The Supreme Court, however, ruled to the contrary in Free Speech Coalition and we are required to follow that precedent.  The Supreme Court decision in Free Speech Coalition did not, however, address military-specific prohibitions in clauses 1 and 2 of Article 134.  Accordingly, we have held that military personnel, unlike their civilian counterparts, can be prosecuted under clauses 1 and 2 of Article 134 for child pornography offenses involving "virtual" children. Mason, 60 M.J. at 16.  Thus, the question we reach today is not whether military personnel can be prosecuted and punished for cases involving "virtual" children but whether the providence inquiry was sufficient to sustain a conviction on a lesser included offense under clauses 1 or 2 of Article 134.

decision in Free Speech Coalition on the CPPA offense. The defect with respect to Specifications 2, 3 and 4 involves the threshold question of whether the CPPA applies to Martinelli's conduct in the first instance.

We conclude, however, that any qualitative difference in the nature of the plea defect does not preclude the potential availability of a lesser included offense under these circumstances. As noted in the Manual for Courts-Martial, conduct that may not constitute a violation of clause 3 in a foreign country may still be punishable under clauses 1 and 2. See MCM, pt. IV. ¶ 60.c.(4)(c)(i).

In O'Connor we recognized that after Free Speech Coalition the possession and receipt of "virtual" child pornography is protected speech under the First Amendment:

> The Supreme Court has now extended a cloak of First Amendment protection to certain depictions of minors engaging in sexually explicit conduct. Accordingly, the question of whether or not the possession of such visual depictions can be viewed as service discrediting now has a constitutional dimension that was not at issue in Sapp or Augustine.[14]

58 M.J. at 454. We then explained that where the constitutional rights of a servicemember could come into play, we will closely

---

[14] United States v. Sapp, 53 M.J. 90 (C.A.A.F. 2000), and United States v. Augustine, 53 M.J. 95 (C.A.A.F. 2000), pre-dated Free Speech Coalition and dealt with the possibility of a lesser included offense under clause 2 of Article 134 where a guilty plea to a CPPA-based clause 3 Article 134 charge was found improvident. In those cases, where no constitutional

36

scrutinize the providence inquiry.  If there are constitutional implications, we will require a more definite showing that the servicemember clearly understood which of his acts were prohibited and why those acts were service-discrediting or prejudicial to good order and discipline before we will find that an improvident plea to a CPPA-based clause 3 offense is a provident plea to a lesser included offense under clause 1 or 2. Id. at 455.

The difference between our review of a providence inquiry under the O'Connor standard and our review under the less strict Augustine/Sapp standard is a qualitative difference.  Although the understanding required of the servicemember remains the same, we require a clearer more precise articulation of the servicemember's understanding under O'Connor than we require in the cases where the accused's First Amendment rights are not implicated.

Applying this stricter scrutiny, we examined the providence inquiry in O'Connor and determined that O'Connor's plea was not provident to a lesser included offense under clause 2 of Article 134 because "[T]here was no specific discussion with Appellant concerning the service-discrediting character of his conduct, much less any constitutional implications his conduct may or may not have had."  O'Connor, 59 M.J. at 455.

---

considerations were involved, we found the pleas provident to a

The next year we used the same analysis in Mason, but reached a different conclusion about the providence of the pleas. 60 M.J. at 18-20. In Mason the military judge used the unconstitutional language but did not focus on or discuss the distinction between "virtual" or "actual" children. Id. at 18. The military judge did, however, discuss the character of the underlying conduct and Mason agreed that his conduct was both service-discrediting and prejudicial to good order and discipline. Id. at 19.

We held that the providence inquiry sufficiently established the nature of Mason's conduct as service-discrediting or prejudicial to good order and discipline even in the absence of a discussion about the "virtual" or "actual" character of the images. Id. at 19-20. The difference between Mason and O'Connor was that the military judge in Mason specifically discussed the character of the underlying conduct and Mason agreed that his conduct was both service-discrediting and prejudicial to good order and discipline.

Given the constitutional implications, the critical inquiry here is whether the record reflects an appropriate discussion of and focus on the character of the conduct at issue as service-discrediting and/or prejudicial to good order and discipline. Id. at 19. In other words, the record must conspicuously

---

clause 2 Article 134 offense.

United States v. Martinelli, No. 02-0623/AR

reflect that the accused "clearly understood the nature of the prohibited conduct" as being a violation of clause 1 and clause 2, Article 134, apart from how it may or may not have met the elements of the separate criminal statute underlying the clause 3 charge. Id. (internal quotation marks omitted)(citing O'Connor, 58 M.J. at 455).

The present record does not support that type of determination. Martinelli's plea inquiry and underlying stipulation of fact were directed solely at demonstrating how his conduct with respect to the child pornography met the elements of the CPPA. For example, during the plea inquiry the military judge set out the elements of each offense (e.g., (1) that the accused knowingly mailed, transported or shipped child pornography in interstate or foreign commerce, (2) that such action was wrongful, and (3) that the accused knew the nature of the images to be child pornography at the time of the offense). He then defined the term "child pornography" using the complete definition set out in 18 U.S.C. § 2556. After walking through the elements of the offense one at a time, the military judge then asked:

> MJ: Trial Counsel, . . . [d]o you have any concerns about whether or not the Court has correctly described the offense as to elements? Do you wish me to inquire about any further elements?

> [Trial Counsel]: No, Your Honor.

39

> MJ: Major Weir, do you believe there are any further
> elements that are not properly described in this
> offense, that the Court ought to inquire about?

[Defense Counsel]: No, sir.

There was no reference to or discussion during the providence inquiry of Martinelli's conduct as service-discrediting or prejudicial to good order and discipline. The absence of this type of inquiry is even clearer when viewed in contrast with the inquiry concerning the separate obstruction of justice specification, where both the stipulation and discussion with the military judge make clear reference to the character of Martinelli's conduct as service-discrediting and/or prejudicial to good order. Under these circumstances, we cannot view Martinelli's guilty plea to the child pornography-related conduct as provident to a lesser included offense under clause 1 or clause 2 of Article 134.

DECISION

The decision of the United States Army Court of Criminal Appeals as to Specifications 1 through 4 of the Charge and the sentence is reversed, but is affirmed in all other respects. The findings of guilty of Specifications 1 through 4 of the Charge and the sentence are set aside and the record of trial is returned to the Judge Advocate General of the Army for a

rehearing on Specifications 1 through 4 and the sentence.[15]  If a rehearing on Specifications 1 through 4 is deemed impracticable, Specifications 1 through 4 may be dismissed and a rehearing held on the sentence alone.  Thereafter, the provisions of Articles 66(b) and 67(a), UCMJ, 10 U.S.C. §§ 866(b), 867(a) (2000), shall apply.

---

[15] Because of our decision in this case, Specifications 1 through 4 will necessarily have to be amended prior to any rehearing to allege lesser included offenses of conduct prejudicial to good order and discipline in the armed forces, or of a nature to bring discredit upon the armed forces in violation of clauses 1 and/or 2 of Article 134.

GIERKE, Chief Judge (concurring in part and dissenting in part):

I agree with the majority that Appellant's plea to specification 1 was improvident under United States v. O'Connor,[1] and I agree that his guilty pleas to the other specifications based on the Child Pornography Prevention Act of 1996 (CPPA)[2] cannot be deemed provident to the lesser included offenses under clauses 1 and 2 of Article 134[3] based the principles discussed in United States v. Mason.[4]  Because the majority remands each of the CPPA-based specifications due to the improvidency of Appellant's pleas, I believe the question of whether the CPPA has extraterritorial application does not need to be reached in this case.  But because the majority chooses to decide the extraterritoriality issue, I must respectfully dissent in part. I cannot agree that the CPPA does not have extraterritorial application.

The most important step in determining if the CPPA applies extraterritorially in this case is to discern whether Congress intended the CPPA to prohibit the acts of a servicemember stationed overseas who sends, receives, reproduces, and possesses child pornography.[5]  To complete this task, we must engage in what Judge Learned Hand called "[by] far the greatest part" of

---

[1] 58 M.J. 450 (C.A.A.F. 2003).
[2] 18 U.S.C. § 2251A (2000).
[3] 60 M.J. 15 (C.A.A.F. 2004).
[4] Uniform Code of Military Justice, UCMJ, 10 U.S.C. § 934 (2000).
[5] See United States v. Bowman, 260 U.S. 94, 97 (1922).

the law: "the interpretation of words."[6] As we do so, we must remember that the words we interpret "cover many diverse instances," including instances that their authors did not fully foresee.[7] Interpretation is "necessarily an act of creative imagination" that requires judges to put themselves in the place of the author of those words and determine "how he would have dealt with the instance that has arisen."[8]

Putting myself in the place of the Congress that adopted the CPPA and determining "how [it] would have dealt with the instance that has arisen,"[9] I disagree with the majority's conclusion that Congress did not intend to prohibit a servicemember from possessing child pornography on a United States military installation or from receiving or reproducing that same pornography that was routed through Internet servers located in the United States.[10] Because Appellant was in Germany when he

---

[6] The Honorable Learned Hand, In Commemoration of Fifty Years of Federal Judicial Service, 264 F.2d 6, 28 (2d Cir. 1959)(proceedings of a special session of the United States Court of Appeals for the Second Circuit, Apr. 10, 1959).
[7] Id.
[8] Id.
[9] Id.
[10] The most perplexing part of today's result is that it allows a servicemember accused of violating the CPPA to be prosecuted domestically for sending the child pornography over the Internet, but not for his other offenses directly related to the same pornography. The result of the majority's holding is that the servicemember can be prosecuted "domestically" for sending pornography from an off-base Internet cafe in Germany. But he cannot be prosecuted for possessing that same pornography in his barracks on a United States military installation, or for receiving or reproducing the child pornography over the same U.S.-based Internet servers that establish the jurisdictional basis for the sending charge.

sent the pornography over the Internet, I also disagree with the majority that applying the CPPA to Appellant's offense of sending the child pornography is a domestic application of the Act.[11]  I believe Congress intended the CPPA to apply extraterritorially and that the Act reaches Appellant's conduct in this case.[12]

I.  The presumption against extraterritoriality

The Supreme Court explained the presumption against extraterritoriality in Equal Employment Opportunity Commission v. Arabian American Oil Company (Aramco).[13]  Aramco was a civil case that involved racial discrimination in employment practices by

---

[11] See, e.g., United States v. Noriega, 746 F. Supp. 1506, 1512-13 (S.D. Fla. 1990)(the United States would be exercising extraterritorial jurisdiction to prosecute "a person standing in Canada who fires a bullet across the border which strikes a second person standing in the United States"); United States v. Baker, 609 F.2d 134, 136 (5th Cir. 1980)(the United States exercises extraterritorial jurisdiction to reach offenses committed in the "marginal sea" which is located just past the "territorial sea" and between three and twelve miles off the coast).

[12] See Walter C. Dauterman Jr., Internet Regulation: Foreign Actors and Local Harms -- at the Crossroads of Pornography, Hate Speech, and Freedom of Expression, 28 N.C.J. Int'l L. & Com. Reg. 177, 183 (2002)("[The] view that the Internet is somehow beyond national regulation ignores the realities of cyberspace.  While it is true that the transnational nature of the Internet may make jurisdictional issues more complicated . . . [g]iven that the Internet is populated by real people causing real harm, there is no reason to believe that [it] is beyond the jurisdictional scope of national regulation.").

[13] 499 U.S. 244, 248 (1991)(noting the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States . . . serves to protect against unintended clashes between our laws and those of other nations which could result in international discord" (internal quotations omitted)(quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20-22 (1963))).

United States companies who employ United States citizens abroad.[14]  The Supreme Court thus applied the presumption against extraterritoriality to employment practices abroad -- which is exactly the kind of domestic concern to which the presumption should apply.  In doing so, the Supreme Court made clear that the presumption applies unless the "language in the [relevant statute] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or some measure of legislative control."[15]

In United States v. Bowman, the Supreme Court was confronted with a jurisdictional issue in a case involving three American citizens and one British citizen who planned to defraud a corporation in which the United States was a stockholder.[16]  The statute under which the defendants were to be prosecuted contained no explicit grant of extraterritorial jurisdiction to try the offenders on the high seas, where the crime took place.[17] In response to the absence of an explicit statement of extraterritorial application in that particular criminal statute, the Supreme Court applied and clarified the exception to the presumption against extraterritoriality.[18]

The Supreme Court delineated two types of criminal offenses in Bowman.  The nature of some criminal offenses, such as those

---

[14]  Id. at 246.
[15]  Id. (internal quotation marks omitted)(quoting Foley Bros., 336 U.S. at 285).
[16]  260 U.S. at 95-96.
[17]  Id. at 97.
[18]  Id. at 98-103.

crimes against private individuals or their property which "affect the peace and good order of the community," is such that the acts that constitute the offenses occur locally.[19]  But other criminal offenses "are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute . . . ."[20]  Thus, when Congress does not explicitly state in the plain language of a particular criminal statute that it intends for that statute to apply extraterritorially, courts can infer such intent "from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved."[21]

I interpret the Bowman language as drawing a dividing line between those criminal offenses that are "domestic" in nature and those whose nature "warrant[s] a broad sweep of power."[22]  For example, a U.S. citizen's assault on his next-door neighbor would affect the "peace and good order of the community" in his

---

[19] Id. at 98.
[20] Id.
[21] United States v. Vasquez-Valasco, 15 F.3d 833, 839 (9th Cir. 1994) (quoting United States v. Felix-Gutierrez, 940 F.2d 1200, 1204 (9th Cir. 1991)(internal quotation marks and citations omitted)); see also Baker, 609 F.2d at 136; United States v. Wright-Barker, 784 F.2d 161, 166-67 (3d Cir. 1986).  See generally Christopher L. Blakesley & Dan Stigall, Wings for Talons:  The Case for the Extraterritorial Jurisdiction Over Sexual Exploitation of Children through Cyberspace, 50 Wayne L. Rev. 109, 124 (2004)(asserting that, in certain situations, the United States will ignore the general rule against extraterritorial application, and assert jurisdiction "over nationals who commit crimes abroad even though the appropriate statute did not explicitly declare that it applied extraterritorially").
[22] Baker, 609 F.2d at 137.

neighborhood and is a domestic crime.  The nature of this offense does not warrant a sweep of power any broader than that provided to the local police force to arrest him.  However, if a U.S. citizen commits a criminal offense whose effects are not confined to one particular situs -- for example, smuggling illegal drugs between countries or trafficking in child pornography over the Internet -- then, the nature of that offense warrants a broader sweep of power.

The majority reads the language in Aramco and Bowman to allow an exception to the presumption only for certain types of criminal statutes -- those enacted so that the Government can defend itself against obstruction or fraud.[23]  However, I do not read this language as narrowly as the majority.  Notably, Bowman was a case about fraud against the Government and, thus, the limiting language on which the majority relies directly applies to the circumstances of that case.[24]

Moreover, I believe that a narrow interpretation of Bowman is inconsistent with the purpose of the criminal offense exception the Supreme Court recognized.  Like Judge Sand, I think the underlying purpose of the criminal offense exception in

---

[23] See Martinelli, 61 M.J. __, __ (12)(C.A.A.F. 2005).
[24] See 260 U.S. at 96.

Bowman is two-fold.[25]  On the one hand, the United States has the right "to protect itself from harmful conduct -- irrespective of the locus of this conduct."[26]  On the other hand, a presumption exists that Congress would not both "enact a statute designed to serve this protective function, and -- where the statute proscribes acts that could just as readily be performed outside the United States as within it . . . undermine this protective intention by limiting the statute's application to United States territory."[27]  By reading the Bowman language to limit the criminal offense exception to crimes of fraud or obstruction against the Government, I believe the majority ignores the underlying rationale of the exception to the presumption against extraterritoriality.

Child pornography, particularly over the Internet, is just the type of offense that falls squarely within the Bowman criminal statute exception to the presumption against

---

[25] See United States v. Bin Laden, 92 F. Supp. 2d 189, 194 (S.D.N.Y. 2000)(holding the Bowman exception to the presumption against extraterritoriality applies to various criminal statutes, such as statutes prohibiting the malicious destruction of property owned or possessed by the United States or the killing in the course of an attack on a federal facility involving a dangerous weapon, but also holding that the exception does not apply to the statute penalizing murder within the "special maritime and territorial jurisdiction of the United States").
[26] Id.; see also Blakesley & Stigall, supra note 21, at 141-42 ("The Constitution interposes no bar as such to the extraterritorial application of criminal law," and thus, if Congress proscribes extraterritorial conduct, "United States law is satisfied.").
[27] Bin Laden, 92 F. Supp. 2d at 194.

extraterritoriality.[28] Child pornography is not an "inherently domestic" crime because it can be received from and sent to the United States by a few simple key strokes on the computer. Images of minors engaging in sexually explicit conduct proscribed by the CPPA can travel through the Internet easily, providing ready access to pedophiles.[29]

Therefore, the first underlying reason for the presumption against extraterritoriality -- that Congress legislates with domestic concerns in mind -- is inapplicable to offenses related to trafficking child pornography. Concluding that the Congress did not intend to reach those individuals who can simply download pornographic images to a website from another country and e-mail them through servers that are located in the United States is inconsistent with Congress' goal of eradicating child

---

[28] See Blakesley & Stigall, supra note 21, at 152 ("Cyberspace is a wonderful tool for education, communication, and entertainment, giving users access to massive volumes of information and connecting people around the world. Unfortunately, this has also generated new opportunities for predators and pornographers to victimize children."); Dauterman, supra note 12, at 177-78 ("The Internet, like the telephone and the printing press, has revolutionized the way people communicate, providing a global audience with instant access to a wealth of political, cultural, and scientific data. . . . Unfortunately, though, there is a much darker and sinister side to the Internet, one full of hate speech and pornography. . . . Sexual deviants have used the Internet to exchange pictures of children being forcibly raped and sodomized.").

[29] See Blakesley & Stigall, supra note 21, at 153-54 ("With the recent technological advances in communication, child exploitation has become an international problem. There can be no doubt that the Internet makes children targets for pedophiles around the globe. As an international system, the Internet . . . is considered the absolute best hunting ground (for a) pedophile, and the most efficient pornography distribution engine even conceived." (internal quotations and citations omitted)).

pornography. The majority's holding "greatly . . . curtail[s] the scope and usefulness"[30] of the CPPA by concluding that § 2252A does not apply extraterritorially.

Furthermore, the other underlying reason given for the presumption against extraterritoriality -- to avoid unintended clashes with the governments of foreign countries -- is also inapplicable to offenses targeted by the CPPA. It is well settled that the United States can assert jurisdiction over offenses that occur outside the territorial jurisdiction of the United States, but that affect the United States.[31] And the United States Government is not invading some right or taking away some interest of a foreign government by prosecuting those individuals who send child pornography into the United States from that foreign country or who receive child pornography that has been sent through the United States. For example, in United States v. Corey,[32] the defendant was a United States citizen who lived in the Philippines and in Japan during his employment with the Air Force as a civilian postmaster. When he was accused of the aggravated sexual abuse of his stepdaughter, neither the Philippines nor Japan protested the United States' assertion of jurisdiction over the defendant, even though he was physically located in those countries when he committed the offenses.[33] "Quite the contrary, both countries have abjured any interest in

_____

[30] Bowman, 260 U.S. at 98.
[31] Id.
[32] 232 F.3d 1166, 1169 (9th Cir. 2000).
[33] Id. at 1171.

9

prosecuting [the defendant], no doubt recognizing that the case involves internal U.S. matters."[34]

Of course the question in this case is whether Germany would protest U.S. jurisdiction over Appellant. And the answer is certainly no. Because of the Status of Forces Agreement that exists between the United States and Germany, Germany agreed that the United States would have the right to exercise jurisdiction over all military servicemembers that the U.S. sends to Germany.[35]

The actions of other countries support the United States' assertion of jurisdiction over a U.S. citizen who violates a statute proscribing child pornography. "Every nation has criminalized the sexual abuse of children, and the vast majority of states have enacted legislation against child pornography."[36] Additionally, "[i]nternational conventions on the rights of children favor the strict enforcement of such laws and lend support to the assertion of extraterritorial jurisdiction of

---

[34] Id.

[35] See Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces art. VII, § 1(a), June 19, 1951, 4 U.S.T. 1792; see also Martinelli, 61 M.J. at __ (10-11)(Crawford, J., dissenting); James B. Roan & Cynthia Buxton, The American Military Justice System in the New Millennium, 52 A.F. L. Rev. 185, 191 n.32 (2002)(noting that the "German government has agreed to a general waiver of their jurisdiction due to the United States military's proven ability to handle disciplinary problems through the [Uniform Code of Military Justice]").

[36] Dauterman, supra note 12, at 203.

these types of cases."[37]  Therefore, asserting federal U.S.

jurisdiction is particularly appropriate in light of the nature

of Appellant's offenses.[38]

II.  Plain meaning of the CPPA

The question of whether the presumption against

extraterritorial application is rebutted for a particular statute

"is a matter of statutory construction" that turns on whether

Congress intended that a particular statute have extraterritorial

application.[39]  Therefore, the tools of statutory construction

should apply.  As articulated by Judge Learned Hand, the most

important aspect of statutory construction is to look to the

meaning of the words of the statute and discern the legislature's

intent in adopting those words.[40]  Furthermore, "[w]herever

possible, statutes should be construed in a commonsense manner

. . . honoring plain meaning . . . and avoiding absurd or

---

[37] Id. at 204 (discussing that the Convention on the Rights of the Child, created by the United Nations in 1989, provides basic international guidelines for the protection of children from sexual exploitation via child pornography); see also Allison M. Scott, Note, From a State-Centered Approach to Transnational Openness: Adapting the Hague Convention with Contemporary Human Rights Standards as Codified in the Convention on the Rights of the Child, 11 Ind. J. Global Legal Stud. 233, 235 n.18 (2004) (noting that the Convention on the Rights of the Child has been ratified by 192 countries, and that only the United States and Somalia have not ratified it, but the United States has formally signed the Convention).

[38] See Dauterman, supra note 12, at 219 (noting that the "universally recognized consensus that child pornography is an evil that should be eliminated enables states to prosecute offenders outside of its borders").

[39] Martinelli, 61 M.J. at __ (9-10 n.4)(citing Hartford Fire Ins. Co. v. California, 509 U.S. 764, 813 (1993)(Scalia, J., dissenting)).

[40] Judge Learned Hand, supra note 6, at 28.

counterintuitive results."[41]  I believe that denying the CPPA

extraterritorial effect is counterintuitive in light of the plain

meaning of § 2252A and Congress' intent to eradicate all forms of

child pornography in passing the CPPA.[42]

Section 2252A can be divided into four types of child

pornography offenses: (1) knowingly mailing or transporting; (2)

knowingly receiving and distributing; (3) knowingly reproducing;

and (4) knowingly selling or possessing.  The proscription on

mailing, shipping, or transporting in "foreign commerce" applies

to all four types of offenses.[43]

The Supreme Court has defined "foreign commerce" as commerce

between the United States and a foreign nation.[44]  I believe the

CPPA's use of the "foreign commerce" language defines the scope

of materials Congress intended to reach -- those child

pornography materials that have traveled in foreign or interstate

commerce -- and is more than just a jurisdictional hook.  In

other words, the inclusion of the "foreign commerce" language was

not "a straightforward reference to the source of authority of

Congress for proscribing these acts as criminal in the first

---

[41] United States v. Carroll, 105 F.3d 740, 744 (1st Cir. 1997)
(internal citations omitted).
[42] See Blakesley & Stigall, supra note 21, at 150-58 (discussing
how federal laws proscribing child exploitation offenses must
apply extraterritorially based on the international nature of the
offense due to recent technological advances in communication,
the comprehensiveness of the legislative scheme that has already
been judicially determined to apply extraterritorially, and
American jurisprudence).
[43] See 18 U.S.C. § 2252A(a)(1)-(3),(5).
[44] Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 193 (1824).

instance, i.e., the Commerce Clause,"[45] but rather, a description

of the material prohibited under the statute. "By proscribing

the distribution of child pornography in 'foreign commerce,'

Congress intended the criminal sanctions to apply even where some

part of the criminal conduct occurred outside the territorial

limits of the United States."[46] Therefore, just as the statute

applies to an individual who sends child pornography from a city

in one state to another state, commonsense and logic would

dictate that "Congress would be equally interested in preventing

that same citizen from making the same distribution to a [U.S.

city] from a foreign country."[47]

Appellant used his Hotmail and Yahoo! e-mail accounts,

which are located on a server in the United States, to send and

receive e-mail messages with embedded or attached images.

Because Appellant was in Germany and outside of the military base

when he sent and received the images, the CPPA would reach his

acts only if it has extraterritorial application. In considering

the extraterritorial application of the CPPA, I find persuasive

the reasoning of Judge Hoeveler of the United States District

Court for the Southern District of Florida. He stated that the

United States would "unquestionably have authority to prosecute a

person standing in Canada who fires a bullet across the border

---

[45] Martinelli, 61 M.J. at ___ (18).
[46] United States v. Martens, 59 M.J. 501, 504 (A.F. Ct. Crim. App. 2003).
[47] Id.

13

which strikes a second person standing in the United States."[48] So U.S. law applies extraterritorially because the actor is located outside of the territorial borders of the United States.

Because of the unique facts of this case, it is particularly appropriate that the CPPA have extraterritorial application. "Given the fact that cyberspace has no borders and distance is [sic] in that realm is irrelevant, there is no reason why U.S. courts should not eschew reliance on traditional notions of territoriality and directly rule that such statutes have extraterritorial application."[49]

"All nations of the world recognize 'the principle that a man who outside of a country willfully puts in motion a force to take effect in it is answerable at the place where the evil is done . . . .'"[50] Similar to a bullet shot from another country, an image of child pornography can be "shot" across borders with the touch of a computer key. And like the individual standing in Canada who fires a bullet into the United States, the U.S. servicemember in Germany who sends or receives the child pornography is subject to U.S. federal jurisdiction.

The plain language of the statute reaches Appellant's acts of possessing, sending, receiving, and reproducing child

---

[48] Noriega, 746 F. Supp. at 1512-13; see also Church v. Hubbart, 6 U.S. (2 Cranch) 187, 234 (1804)("[A nation's] power to secure itself from injury, may certainly be exercised beyond the limits of its territory.").

[49] Blakesley & Stigall, supra note 21, at 147.

[50] Noriega, 746 F. Supp. at 1513 (citing Rivard v. United States, 375 F.2d 882, 887 (5th Cir. 1967)).

pornography that has been "mailed, shipped or transported in interstate or foreign commerce."[51]  The "foreign commerce" language of the statute is satisfied by Appellant's admission that he used Hotmail and Yahoo! accounts to send, receive, and store the pornographic images.  Moreover, this link to the United States, by sending the images through and storing the images in Internet servers located in the United States, makes it even more implausible that Congress did not intend the CPPA to reach conduct like Appellant's.

Based on the plain meaning of the statute, it appears that Congress wanted to explicitly extend jurisdiction over those individuals who possess child pornography not only within the territorial boundaries of the United States, but also on any land or building under the control of the United States.[52]  In other words, Congress' addition of the "on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government" language clearly establishes jurisdiction over an individual who admits to being on property "under the control of the United States" when he possessed the obscene material.[53]  Because Appellant admitted to being on

---

[51] See 18 U.S.C. § 2252A(a)(1)-(3).
[52] See 18 U.S.C. § 2252A(a)(5)(A),(B).  Section 2252A(a)(5)(A) proscribes knowingly possessing child pornography in the "special maritime and territorial jurisdiction of the United States, or on any land or building owned by, leased to, or otherwise used by or under the control of the United States Government."  Section 2252A(a)(5)(B) proscribes knowingly possessing child pornography that has been "mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."
[53] See 18 U.S.C. § 2252A(a)(5)(A).

property "under the control of the United States" -- his barracks at the Cambrai Fritsch Kaserne, a United States Army installation in Darmstadt, Germany -- his offense of possessing child pornography on a United States military installation is proscribed by the CPPA.

The majority argues that this language would "just as easily apply only to . . . domestic military installations."[54] We have explicitly rejected such a reading of "territory under the control or jurisdiction" of the United States. In United States v. Wilmot,[55] we held that this language included in the Narcotics Control Act of 1956[56] made the statute applicable to drug offenses committed at Yokota Air Force Base in Japan.

I agree with the majority that neither the "foreign commerce" language nor the "special maritime and territorial jurisdiction of the United States" language alone evidences a clear congressional intent for a statute to apply extraterritorially.[57] But the question is not whether particular words within the statute can be defined to establish extraterritorial jurisdiction, but whether Congress intended the

---

[54] Martinelli, 61 M.J. at __ (21).
[55] 11 C.M.A. 698, 702, 29 C.M.R. 514, 518 (1960).
[56] Pub. L. No. 84-728, 70 Stat. 567 (repealed 1970).
[57] See Martinelli, 61 M.J. at __ (17-22).

statute itself to apply to Appellant's offenses.[58]  As discussed in further detail below, the CPPA was enacted as part of a comprehensive congressional scheme aimed at eradicating child pornography.  I believe that interpreting the plain language of the CPPA, its structure and the comprehensive scheme of the entire statute, leads to the conclusion that Congress clearly meant for the CPPA to apply extraterritorially to reach Appellant's acts in this case.  The key question is whether the Congress that passed the CPPA intended to prohibit or allow the possession of child pornography on a U.S. military base overseas. The answer is obvious.

Relying on only two criminal cases -- this Court's 1977

---

[58] Because the issue in this case is whether Congress intended the CPPA to apply extraterritorially to reach Appellant's offenses, and because I believe that it does, there is no need to decide whether 18 U.S.C. § 7(3) (2000), which defines "special maritime and territorial jurisdiction of the United States," has extraterritorial application in this case.  Compare United States v. Gatlin, 216 F.3d 207, 220 (2d Cir. 2000)(holding that 18 U.S.C. § 7(3) does not apply extraterritorially to reach appellant's offense of sexual abuse of a minor on a United States military installation in the Federal Republic of Germany), with Corey, 232 F.3d at 1183 (holding that 18 U.S.C. § 7(3) applies extraterritorially to appellant's offense of sexual abuse of a minor on an Air Force base in Japan and in an off-base private apartment building in the Philippines).  See also Blakesley & Stigall, supra note 21, at 147 (asserting that the holding of Gatlin, 216 F.3d 220, is based on the same flawed reasoning as the holdings in Corey, 232 F.3d 1183, and United States v. Cream, 58 M.J. 750, 755 (N-M. Ct. Crim. App. 2003), because "[t]here is no need to look to 18 U.S.C. § 7(3) or traditional notions of territoriality to find jurisdiction over the acts of pedophiles abroad.  Given the fact that cyberspace has no borders and distance in that realm is irrelevant, there is no reason why U.S. courts should not eschew reliance on traditional notions of territoriality and directly rule that such statutes have extraterritorial application.").

opinion in United States v. Gladue[59] and Gatlin,[60] a Second Circuit case -- the majority dismisses the multiple opinions of other federal courts that interpret the Bowman exception to apply more broadly than solely to offenses that involve fraud or obstruction against the Government.[61] The majority opinion is also

---

[59] 4 M.J. 1, 5 (C.M.A. 1977). I believe our Court in Gladue misread the Bowman exception to the presumption against extraterritoriality and defined it too narrowly. A statute may not indicate, on its face, a congressional intent to be given extraterritorial application. But such intent can be "readily implied" from the nature of the offense targeted by the statute and if to deny extraterritorial application "would be greatly to curtail the scope and usefulness of the statute[]." Wright-Barker, 784 F.2d at 167 (citations and internal quotation marks omitted); see also Vasquez-Valasco, 15 F.3d at 839 (citing Felix-Gutierrez, 940 F.2d at 1204); Baker, 609 F.2d at 136.

[60] 216 F.3d at 211 n.5. Interestingly, although the majority relies on footnote five in the Gatlin opinion to support its narrow reading of the Bowman language, the Second Circuit itself rejected such a narrow reading in an earlier opinion. Citing Baker, 609 F.2d at 139, the Second Circuit held that the "intent to cause effects within the United States . . . makes it reasonable to apply to persons outside United States territory a statute which is not expressly extraterritorial in scope." United States v. Orozco-Prada, 732 F.2d 1076, 1087-88 (2d Cir. 1984)(internal quotation marks omitted).

[61] See Vasquez-Velasco, 15 F.3d at 843 (concluding that the statute applies extraterritorially to defendant's act of murdering both a U.S. citizen and a legal resident alien of the U.S. in Mexico to further a drug trafficking enterprise); United States v. Thomas, 893 F.2d 1066, 1068-70 (9th Cir. 1990)(holding that 18 U.S.C. § 2251(a) applied extraterritorially to defendant's acts in Mexico of engaging a minor in sexually explicit conduct for the purpose of creating a visual depiction of that conduct, mailing visual depictions of the conduct, and receiving the material); Baker, 609 F.2d at 136-39 (concluding that the statute proscribing the possession of narcotics with the intent to distribute applies extraterritorially to possession beyond the three-mile limit of the "territorial sea"); United States v. Harvey, 2 F.3d 1318, 1327-30 (3d Cir. 1993)(holding that sentencing guideline addressing the offense of causing a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct applies when the offense occurs in the Philippines). See also United States v. Bredimus, 234 F. Supp. 2d 639, 650 (N.D. Tex. 2002)(deciding that

inconsistent with precedent from our intermediate level appellate courts which, although not binding on this Court, have construed the CPPA and decided that it applies extraterritorially.[62]

III. Comprehensive scheme of the CPPA

When determining whether a statute applies extraterritorially, courts are not "limited to the text of the statute itself. To the contrary, [courts] are permitted to consider 'all available evidence' about the meaning of the statute, including its text, structure, and legislative history."[63] In 1996, Congress added § 2252A to Chapter 110 of Title 18 of the United States Code, which defines the offenses related to the Sexual Exploitation and Other Abuse of Children.[64]

---

18 U.S.C. § 2251A applies extraterritorially to traveling in foreign commerce with the intent to use minors to produce visual depictions of sexually explicit conduct); Felix-Gutierrez, 940 F.2d at 1204 (holding that the Bowman criminal offense exception applies to the murder of a Drug Enforcement Administration agent in Mexico).

[62] See, e.g., United States v. Kolly, 48 M.J. 795, 797 (N-M. Ct. Crim. App. 1998)(holding that 18 U.S.C. § 2252(a)(2) applies extraterritorially to the receipt of child pornography the appellant ordered while stationed in Hawaii, and had sent from a supplier in Florida to Japan, where the appellant was later stationed); Martens, 59 M.J. at 505 (concluding that Congress intended 18 U.S.C. § 2252(a)(2)(A) to apply extraterritorially to the receipt of child pornography at Ramstein Air Base in Germany); United States v. Pullen, 41 M.J. 886, 888 (A.F. Ct. Crim. App. 1995) (holding that the language of 18 U.S.C. § 2252(a)(4)(A) is broader than that in the statute at issue in Wilmot, 11 C.M.A at 700, 29 C.M.R. at 516, and is therefore a clear expression of Congress' intent to apply it extraterritorially to the possession of child pornography on Clark Air Base in the Philippines).

[63] Gatlin, 216 F.3d at 212 (quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 177 (1993)).

[64] Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, div. A, tit. I, § 121(3)(a), 110 Stat. 3009 (codified as amended at 18 U.S.C. § 2252A (2000)).

The history of the CPPA can be traced to 1977 when Congress passed the Protection of Children Against Sexual Exploitation Act.[65]

In the time period between the initial enactment of the 1977 Act and today, Congress has repeatedly emphasized its intent to eradicate the exploitation of children and has acted on this intent by continuously expanding federal jurisdiction over offenses involving child pornography wherever they occur. For example, regarding a 1996 hearing on the CPPA, Senator Joseph Biden noted that Congress has "kept a sharp eye on the problem of child pornography, and where [it] has found gaps in the coverage of the criminal law, [it] ha[s] moved quickly to fill them."[66] Thus, when the "computer was [first] becoming an increasingly important tool of the child pornographer," Congress reacted by "making it a federal crime to transport child pornography using a computer in addition to the mails."[67] In 1998, Congress passed the Protection of Children from Sexual Predators Act, modifying and adding additional statutes to 18 U.S.C. §§ 2251-2257.[68] As Senator Leahy observed:

> The goal of [the act] is to provide stronger protections for children from those who would prey upon them. Concerns over protecting our children have only intensified in recent years with the growing popularity of the Internet and World Wide Web. Cyberspace gives users access to a wealth of

---

[65] Pub. L. No. 95-225, 92 Stat. 7 (codified as amended at 18 U.S.C. § 2251 (2000)).

[66] Statement of Sen. Joseph R. Biden (regarding hearing on Child Pornography Prevention Act)(June 4, 1990), available at 1996 WL 292976 (F.D.C.H.).

[67] Id. at 1-2.

[68] Pub. L. No. 105-314, 112 Stat. 2974 (1998).

information; it connects people from around the world. But it also creates new opportunities for sexual predators and child pornographers to ply their trade.[69]

Numerous courts agree that Congress has created a "comprehensive scheme" to combat and eradicate child pornography.[70] These courts typically quote the language from Bowman to conclude that the section applies extraterritorially because to hold otherwise would "greatly . . . curtail the scope and usefulness of the statute."[71] For example, inferring the exercise of extraterritorial power of 18 U.S.C. §§ 2251(a) and 2252(a) from the nature of the offenses defined in each statute,

---

[69] 144 Cong. Rec. S12263 (daily ed. Oct. 9, 1998) (statement of Sen. Patrick Leahy).

[70] See Harvey, 2 F.3d at 1327-29 (holding that 18 U.S.C. § 2251 was enacted as part of Congress' continuing effort to contain evils caused on American soil by foreign as well as domestic suppliers of child pornography, and to deny extraterritorial application of the Act would "greatly curtail the scope and usefulness" of the statute); Martens, 59 M.J. at 504 (concluding that, because the CPPA includes several provisions that clearly reach conduct occurring outside the United States, "the statutory framework compels the conclusion that Congress intended it to apply broadly to counter the sexual exploitation of children"); Bredimus, 234 F. Supp. 2d at 649-50 (holding that 18 U.S.C. § 2251A should apply extraterritorially because, given the location of the statute in the criminal portion of the U.S. Code and the nature of the offense, the section was enacted to expand Congress' statutory scheme to combat sexual exploitation of children, both domestic and abroad, and because it "only makes sense" that the statute would apply to the conduct of United States citizens on foreign soil; otherwise, the comprehensive scheme to combat international trafficking of child pornography and sexual exploitation of children could not be effectively implemented as contemplated by Congress); Kolly, 48 M.J. at 797 (holding that 18 U.S.C. § 2252(a)(2) of the CPPA applied extraterritorially because "to allow a U.S. citizen in the United States who ordered child pornography through the United States postal service to escape prosecution simply because he is overseas when he finally receives it would greatly . . . curtail the scope and usefulness" of the CPPA).

[71] Bowman, 260 U.S. at 98.

21

as well as Congress' other legislative efforts to eliminate child pornography, the Ninth Circuit in Thomas determined that Congress created a comprehensive statutory scheme to eradicate sexual exploitation of children.[72]  Because "[p]unishing the creation of child pornography outside the United States that is actually, is intended to be, or may reasonably be expected to be transported in interstate or foreign commerce is an important enforcement tool . . . . [I]t [is] likely that under section 2251(a) Congress intended to reach extraterritorial acts that otherwise satisfy statutory elements."[73]  The same principle applies to Congress' intent in enacting 18 U.S.C. § 2252A.

IV.  Conclusion

I agree with the majority's decision that Appellant's guilty plea to specification 1 is improvident under O'Connor and that his guilty pleas to the other CPPA-based specifications are improvident to the lesser included offenses under clauses 1 and 2 of Article 134 under Mason.  Therefore, I concur in part.

I disagree, however, with the majority's determination that the CPPA does not apply extraterritorially to reach Appellant's offenses.  I believe the Bowman exception to the presumption against extraterritoriality applies in this case based on the nature of the offenses which the CPPA targets and because to deny application of the exception would greatly curtail the scope and usefulness of the CPPA.  Congressional intent for a statute to

---

[72] Thomas, 893 F.2d at 1068-69.
[73] Id. at 1069 (internal footnotes omitted).

apply extraterritorially can be inferred in criminal statutes, even in the absence of an explicit statement, based on the text of the entire statute, its legislative history and structure. A reading of the CPPA, together with the comprehensive scheme of the Act and repeated efforts by Congress to eradicate child exploitation and expand federal jurisdiction over these types of offenses, shows a clear congressional intent for the CPPA to apply extraterritorially to Appellant's acts in this case. Therefore, I must respectfully dissent in part.

Finally, I note that today's opinion construes a generally applicable federal criminal statute rather than a Uniform Code of Military Justice provision. While federal circuit precedent exists on both sides of this issue, the majority's holding is against the weight of authority. This issue cries out for our superior court to settle this dispute among the federal courts of appeals.

United States v. Martinelli, No. 02-0623/AR

CRAWFORD, Judge (dissenting):

This case presents three issues of immediate importance and worldwide impact: (1) the domestic aspect of Internet transactions initiated outside the United States that result in the receipt, reproduction, or transmission of electronic images within or from discrete, electronic "space" on Internet servers located within the United States; (2) the extraterritorial application of the Child Pornography Prevention Act of 1996 (CPPA), 18 U.S.C. § 2252A (2000), to members of the armed forces stationed overseas; and (3) the providence of a guilty plea to violations of the CPPA when the record clearly demonstrates Appellant's knowledge of the "actual" nature of the victims, but the military judge explains the offenses to Appellant using language found to be overbroad in Ashcroft v. Free Speech Coalition.[1]

I must respectfully dissent from the lead opinion's holding that § 2252A does not apply to Appellant's conduct in Germany, that Appellant's receipt, reproduction, and distribution of electronic, pornographic images did not occur in the United States, and from the majority's holding that Appellant's plea to specification 1 was improvident based on United States v. O'Connor, 58 M.J. 450 (C.A.A.F. 2003). In specifications 1, 2, and 3 Appellant was charged under Article 134, Uniform Code of

_____

[1] 535 U.S. 234 (2002).

Military Justice (UCMJ), 10 U.S.C. § 934 (2000), with knowingly and wrongfully, by means of a computer, mailing, transporting, shipping, receiving, and reproducing child pornography in "interstate or foreign commerce" at an Internet café in Darmstadt, Germany, in violation of § 2252A. He was also charged under Article 134 with receiving child pornography and with possessing child pornography on a United States Army installation, in violation of § 2252A, in specification 4. The mailing, transporting, shipping, receiving, and reproducing occurred at Hotmail and Yahoo! computer servers located in the United States, with each such action having been effected by Appellant's physical contact with a computer terminal located in Darmstadt, Germany.

The lead opinion takes the position that a citizen-soldier who is knowingly sending, receiving, and reproducing computer images of actual children engaged in graphic sexual conduct in "interstate or foreign commerce," who is possessing those images on a United States military installation, and –– because of the nature of Hotmail and Yahoo! e-mail accounts –– whose sending, receipt, reproduction, and possession is simultaneously occurring on e-mail servers located in the United States, cannot be prosecuted under § 2252A. Not only is that position unsettling, but it constitutes a dramatic shift in this Court's view of military criminal jurisdiction.

I.  Domestic Application of § 2252A

When Appellant sat in the Netzwerk Internet Café in Darmstadt, Germany, he didn't open envelopes, remove photographs, copy photographs, place photographs in envelopes, or place those envelopes in a mail drop, at least not in the physical sense.  Appellant rented a web browser, which he used to visit Internet websites and to gain access to his Hotmail or Yahoo! e-mail accounts.  These particular e-mail accounts are "web-based," as distinct from e-mail operated through a local client such as Microsoft Outlook (a program that can be locally installed and which creates a local storage facility for e-mail files and attachments).  Because "web-based" accounts operate without a local server and consist of discrete pools of information electronically assembled and stored under a user's filename on a client server owned by the host, all of Appellant's e-mails -- and their attachments -- were "resident" on the Internet servers of Hotmail and Yahoo!, located in the United States.

While this is not the technology many of us grew up with, it is the technology that prevails today.  It is the technology that appellants and counsel not infrequently must explain to judges and, more to the point, it is the technology Appellant

stipulated to and explained to the military judge during the Care[2] inquiry in this case.

The majority misconstrues the "routed through" language in the stipulation to conclude that all the images -- including those attached to e-mail -- were located outside the United States when Appellant sent or received them or when he reproduced them, and that when Appellant sent or received them they all merely went "through" the United States in electronic form.

What actually occurred, at least on those occasions that Appellant sent or received images by e-mail, is that Appellant, by typing on the keyboard of a computer in Darmstadt, used his electronic address on a server located in the United States, to send and receive e-mail messages with embedded or attached images, to and from his address on that server. Appellant also used his "space" on the Hotmail and Yahoo! servers in the United States to store pornographic images of children, which was made crystal clear by the language of specification 5,[3] the testimony

---

[2] United States v. Care, 18 C.M.A. 535, 40 C.M.R. 247 (1969).

[3] "Specification 5 states that Appellant wrongfully endeavor[ed] to impede an investigation into his own misconduct by asking SPC Morgan A. Oviatt to destroy evidence that the said SPC Christopher P. Martinelli had received and possessed child pornography in violation of 18 U.S. Code § 2252A, to wit: by deleting all files with attachments from his two electronic mail accounts." Emphasis added.

of Specialist (SPC) Oviatt and Appellant's admissions during the providency inquiry.

Appellant also admitted to downloading images directly onto the hard drive of a computer at the Netzwerk Internet Café and onto portable disks that Appellant took back to the barracks. But Appellant also admitted that each day, after he had left the Netzwerk Internet Café, many if not all of the images Appellant had collected, reproduced, or sent to others remained stored, under his name, in his user account, on the servers of Hotmail and Yahoo! within the territorial borders of the United States.

Because much of the storage of images, all of the sending, and all of the receiving, actually occurred in the electronic space controlled by Appellant on Hotmail and Yahoo! servers in the United States, the crimes of sending and receiving were committed there.[4]  Further, although some of the products of Appellant's reproduction (e.g., the portable computer disks Appellant took back to his barracks) were located in Germany, much of the actual reproduction occurred on the servers where those images were located, in electronic form, in the United States.

In light of these facts of record, there was a domestic application of § 2252A to specifications 1 through 3.

---

[4] As reflected in the specifications, they were simultaneously committed in Germany, a proposition discussed below.

II.  Extraterritoriality

If required to examine § 2252A and Article 134, in an extraterritorial setting, I would follow this Court's precedents and the great bulk of federal case law, while considering the worldwide deployment of our forces, and the melding of federal statutes in Article 134.

## FACTS

As detailed above, Appellant possessed over sixty images of child pornography on a U.S. military installation in Germany. He also used a computer in a German community to effect the repeated reproduction, transmission, and receipt of child pornography in interstate and foreign commerce.  Appellant's electronic transactions were, at a minimum, routed through Internet servers in the United States:

> In Prosecution Exhibit 1, Appellant stipulated that
>
> [a]ll e-mail sent to or received from the accused's Yahoo or Hotmail e-mail accounts is electronically routed through the respective service's computers in the United States.  As a result, all of the child pornography that the accused had either sent or received using these two accounts was transported through interstate or foreign commerce.
>
> As a matter of practice, over the course of the year, after copying the child pornography onto floppy diskettes, the accused would then take the diskettes to his barracks room in building 4002 on the Cambrai Fritsch Kaserne, Darmstadt, Germany.  The Cambrai

6

> Fritsch Kaserne is a U.S. Army installation used by
> and under the control of the United States Government.[5]

Emphasis added.

### DISCUSSION

Outside the military context, modern law recognizes five theories in support of extraterritorial application of a sovereign's jurisdiction: (1) regulating conduct of its citizens; (2) regulating activities which have a substantial territorial effect; (3) regulating extraterritorial conduct when there is a connection between the act and national security; (4) asserting jurisdiction as to crimes against humanity; and (5) asserting jurisdiction where the victim of the act is a citizen of the state asserting jurisdiction.[6]

In the context of United States servicemembers, Congress' authority to "make Rules for the Government and Regulation of the land and naval forces,"[7] creates additional sources of jurisdiction under Article 134.

---

[5] Before this Court, the Government noted "the child pornography at issue moved in 'foreign commerce' because it was filtered through internet service providers operating from the United States."

[6] See Restatement (Third) Foreign Relations Law §§ 401–402 (1986).

[7] U.S. Const. art. I, § 8, cl. 13.

Citizenship

Notwithstanding the common law presumption against extraterritorial application of a sovereign's law,[8] there remains little question as to the power of Congress to extend application of U.S. criminal statutes to the acts of U.S. citizens undertaken beyond our territorial borders.  The extraterritorial reach of federal statutes, at least as to citizens, arose as far back as 1824, when the United States Supreme Court recognized the nationality principle.  In The Apollon,[9] the Court stated:  "The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens."  Again in 1960, the Court hinted that nationality-based jurisdiction over civilian dependents of military personnel overseas was possible but venue would lie in the United States.[10]  Clearly, Appellant is a citizen.

Effects

In addition to the nationality justification for jurisdiction, the effects doctrine also applies to conduct from outside the border that has a consequence or effect within the

---

[8] United States v. Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949).

[9] 22 U.S. 362, 370 (1824).

[10] Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 246 (1960); see also United States ex rel. Toth v. Quarles, 350 U.S. 11, 21 (1955).

border, provided Congress has the authority in that area. Just as the Federal Government can defend itself "against obstruction[] or fraud wherever perpetrated,"[11] it also can cast a wide net for drug trafficking, or in this case, trafficking in child pornography. In United States v. Felix-Gutierrez,[12] the Ninth Circuit applied a criminal accessory statute -- silent as to extraterritorial application -- to the murder of a Drug Enforcement Agency (DEA) agent in Mexico. Finding extraterritorial application of the laws of the United States constitutionally permissible, the court emphasized the need to look at both the express and implied congressional intent in deciding whether the law should be given extraterritorial application. Agreeing with the Fifth Circuit's analysis in United States v. Baker,[13] the Felix-Gutierrez court noted that the effectiveness of the statute would be compromised if the citizens of the United States could commit these offenses abroad without the intercession of the United States Government.[14] Permitting the Government to exercise extraterritorial jurisdiction comports with the international principle of protective jurisdiction because the underlying crime affected

---

[11] United States v. Bowman, 260 U.S. 94, 98 (1922).

[12] 940 F.2d 1200, 1204 (9th Cir. 1991).

[13] 609 F.2d 134, 136 (5th Cir. 1980).

[14] Felix-Gutierrez, 940 F.2d at 1204.

the nation itself.[15]  As Judge Hand recognized in United States

v. Aluminum Co. of America,[16] concluding that the Sherman Act

applied to conduct that took place entirely outside the United

States but had a territorial effect on exports and imports:  "It

is settled law . . . that any state may impose liabilities, even

upon persons not within its allegiance, for conduct outside its

borders that has consequences within its borders which the state

reprehends. . . ."

Further, construing the statute against extraterritorial

application to members of the armed forces stationed abroad has

practical effects that would thwart the plainly stated intent of

Congress to eradicate child pornography.  If this had been a

contested case, the material that Appellant transmitted and

received could have been obtained pursuant to a search warrant

from a United States Internet site.[17]  The search would not have

required the consent of German officials.  This is not an

instance where United States law enforcement officials need the

assistance, or even indulgence, of another territory to enforce

---

[15] See id. at 1206.

[16] 148 F.2d 416, 443 (2d Cir. 1945) (citations omitted).

[17] See generally United States v. Maxwell, 45 M.J. 406 (C.A.A.F. 1996)(warrant executed at site of interstate Internet service provider).

its law.[18] Nor is this an instance of the searching state having a stronger interest in the data than the state in which the data is stored. Both are the same. The searching state knows where the data is and there would be no interference with another state as a byproduct of the search. Just as clearly, this is not an instance of extraterritorial criminal enforcement that would "potentially frustrate one of the central purposes of the presumption against extraterritoriality -- namely, the prevention of 'unintended clashes between our laws and those of other nations which could result in international discord.'"[19] As with nearly all other members of our armed forces, Appellant was subject to a Status of Forces Agreement. Such agreements have provided, since before United States v. Gatlin,[20] that "the military authorities of the sending State shall have the right to exercise within the receiving State all criminal and disciplinary jurisdiction conferred on them by the law of the sending State over all persons subject to the military law of

---

[18] See generally Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitesme, 169 F. Supp. 2d 1181 (N.D. Cal. 2001)(court declined to enforce a French order, but did not rule that the French were without proper jurisdiction to prevent the distribution of anti-Semitism on the Internet in France).

[19] United States v. Gatlin, 216 F.3d 207, 216 n.11 (2d Cir. 2000)(quoting Equal Employment Opportunity Commission v. Arabian American Oil Co. (Aramco), 499 U.S. 244, 248 (1991).

[20] Id. at 207.

that State."[21]  Appellant's prosecution for these crimes was not merely tolerated by German authorities, it was officially condoned pursuant to an international treaty.

### Plain Meaning of § 2252A

While citizenship and impact on "interstate and foreign commerce" provide sufficient bases for jurisdiction, there is an additional basis for applying the statute extraterritorially -- the plain meaning and purpose of the statute itself.  "While the legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States, the question of its application, [extraterritorially] is one of construction, not of legislative power."[22]  "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.  Whether Congress has in fact exercised that authority . . . is a matter of statutory construction."[23]

This case deals with a specific federal statute, i.e., § 2252A, which provides:

---

[21] Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, art. VII § 1(a),. June 19, 1951, 4 U.S.T. 1792.

[22] Blackmer v. United States, 284 U.S. 421, 437 (1932) (citations omitted).

[23] Aramco, 499 U.S. at 248.

(a) Any person who —-
     (1) knowingly mails, or transports or ships in interstate or foreign commerce by any means, including by computer, any child pornography;
     (2) knowingly receives or distributes --
          (A) any child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer; or
          (B) any material that contains child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . .
. . . .
     (5)(B) knowingly possesses any . . . computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . .
. . . .
shall be punished as provided in subsection (b).

Emphasis added.

When interpreting this statute, it is appropriate to look at the plain meaning of the statute,[24] its history, and the purpose of the statute.[25]

The Commerce Clause grants Congress the power "to regulate commerce with foreign Nations . . . ."[26]  Section 2252A was an exercise by Congress of its authority over interstate and

---

[24] Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000)("[W]hen the statute's language is plain, the sole function of the courts —- at least where the disposition required by the text is not absurd —- is to enforce it according to its terms.")(internal quotation marks and citations omitted).

[25] The purpose of the statute might be an important aspect of statutory interpretation.  Geier v. American Honda Motors Co., 529 U.S. 861, 888 (2000).

[26] U.S. Const. art. I, § 8, cl. 3.

foreign commerce.  This power to regulate foreign commerce has been broadly construed to encompass all "transactions which either immediately, or at some stage of their progress, must be extraterritorial."[27]

Certainly, Congress is interested in controlling commerce in cyberspace as evidenced by the statute.  This statute is a broad, comprehensive scheme to eradicate, or at least control, sexual exploitation of children.  It was part of the CPPA.  In expanding the congressional statute, Congress specifically found that "elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct. . . ."[28]

I cannot join the majority's conclusion that because the CPPA was enacted to "protect children from abuse," United States v. Martinelli, 61 M.J. __, __ (12) (C.A.A.F. 2005), it therefore focuses on individual victims and cannot fall within the "second category" of criminal statutes described in Bowman.  Similar language has been applied by numerous federal circuits in recognizing that many criminal prohibitions enacted by Congress

---

[27] Veazie v. Moor, 55 U.S. 568, 573 (1852).

[28] Child Pornography Prevention Act, Pub. L. No. 104-208, div. A., tit. I, § 121 (1)(13), 110 Stat. 3009.

were intended primarily to protect the national interest, as opposed to the property or persons of individuals.[29]

Not only on the weight of decisional law in the federal circuits and our own precedents, but based on the compelling similarities between this Nation's struggle against the production, importation, distribution, and possession of illegal drugs and the much more recent efforts to combat the creation, distribution, and possession of child pornography, I conclude that, even if applied extraterritorially, Appellant's plea and

---

[29] E.g., United States v. Harvey, 2 F.3d 1318 (3d Cir. 1993) (possession of child pornography under 18 U.S.C. § 2252(a)(4)(B) (subject to aggravated punishment even though aggravating factor occurred in Philippines); United States v. Wright-Barker, 784 F.2d 161 (3d Cir. 1986) (drug offenses on the high seas); United States v. Thomas, 893 F.2d 1066 (9th Cir. 1990)(using a minor in Mexico to produce child pornography violating 18 U.S.C. § 2251(a)); Chandler v. United States, 171 F.2d 921 (1st Cir. 1948)(treason by U.S. citizen in Germany); United States v. Yousef, 327 F.3d 56 (2d Cir. 2003)(attempting to damage U.S. aircraft in flight outside U.S.); United States v. Brown, 549 F.2d 954 (4th Cir. 1977)(conspiracy to import heroin to U.S. from Germany involving an Army sergeant stationed in Germany); United States v. Erdos, 474 F.2d 157 (4th Cir. 1973)(murder of U.S. citizen by U.S. citizen at U.S. embassy in Guinea); United States v. Perez-Herrera, 610 F.2d 289 (5th Cir. 1980)(conspiracy and attempted importation of marijuana into U.S. from high seas); United States v. Baker, 609 F.2d 134 (5th Cir. 1980)(possession with intent to distribute marijuana nine miles off Florida coast); United States v. Dawn, 129 F.3d 878 (7th Cir. 1997)(possession of child pornography under 18 U.S.C. § 2252(a) subject to aggravated punishment even though aggravating factor occurred in Honduras); United States v. Schmucker-Bula, 609 F.2d 399 (7th Cir. 1980)(conspiracy to import cocaine in Colombia); United States v. Plummer, 221 F.3d 1298 (11th Cir. 2000)(attempted smuggling forty miles off Florida coast); Feliz-Gutierrez, 940 F.2d 1200 (kidnapping and murder of DEA agent in Mexico).

conviction by application of § 2252A was jurisdictionally proper.

Appellant's Military Status

A final rationale for jurisdiction to prosecute Appellant arises under the UCMJ. Pursuant to this authority, Congress has provided that under Article 134 "all disorders and neglects to the prejudice of good order and discipline in the armed forces" or conduct which would bring "discredit upon the armed forces" may be tried under the UCMJ. The UCMJ specifically provides for extraterritorial jurisdiction.[30] In light of Article 36, UCMJ,[31] it is clear that clause 3 of Article 134 contemplates prosecution of crimes such as those enumerated in § 2252A.

Congress delegated authority to the President to prescribe "[p]retrial, trial, and post-trial procedures, including modes of proof, for cases" triable under the UCMJ.[32] In the Manual for Courts-Martial, United States (MCM) (2002 ed.), pt. IV, ¶ 60.c(4)(c)(i) notes that under clause 3 of Article 134, "[t]here are two types of congressional enactments of local application: specific federal statutes (defining particular crimes), and a

---

[30] Article 5, UCMJ, 10 U.S.C. § 805 (2000).

[31] 10 U.S.C. § 836 (2000).

[32] Id. at § 836(a).

16

general federal statute, the Federal Assimilative Crimes Act
(which adopts certain state criminal laws)."

This approach was recognized in United States v. Scholten.[33]
In Scholten, this Court held that there are four jurisdictional
bases to try an individual for kidnapping overseas, including
"interstate or foreign commerce, maritime or territorial
jurisdiction, special aircraft jurisdiction and foreign guests
of the government."[34]  Even though 18 U.S.C. § 1201(a), the
statute at issue in Scholten, does not apply under clause 3, it
may be charged under clauses 1 and 2 where the conduct is
prejudicial to good order and discipline or of a nature to bring
discredit upon the armed forces.[35]  Thus, assuming Appellant was
not engaged in "interstate or foreign commerce," those clauses
would also permit the prosecution of Appellant under the UCMJ.

For all of the above reasons, I respectfully dissent from
the majority's holding that § 2252A does not have
extraterritorial application.  The impact of this holding is
far-reaching because it overlooks our prior case law[36] and

---

[33] 17 M.J. 171 (C.M.A. 1984).

[34] Id. at 173 (citation and internal quotation marks omitted).

[35] Id. at 173-74.

[36] See, e.g., United States v. Collins, 7 M.J. 188 (C.M.A. 1979);
United States v. Jackson, 17 C.M.A. 580, 38 C.M.R. 378 (1968);
United States v. Wilmot, 11 C.M.A. 698, 29 C.M.R. 514 (1960);
United States v. Blevens, 5 C.M.A. 480, 18 C.M.R. 104 (1955).

forecloses application by military authorities of numerous federal statutes overseas.[37]

III.  Providence of the Plea

I also dissent from the majority's conclusion that Appellant's pleas were improvident in light of Ashcroft v. Free Speech Coalition.[38]  In my dissent from a similarly erroneous conclusion by this Court in O'Connor, 58 M.J. at 456-457 (Crawford, C.J., dissenting), I emphasized that O'Connor's pleas were factually provident to offenses involving actual children and therefore unaffected by Free Speech Coalition. Notwithstanding nearly unanimous support for this position in the federal circuits that have addressed that very question of law, the majority steadfastly moves this Court, without justification, on a path that threatens, rather than protects, the military community by providing extra "rights" for servicemembers who possess, traffic in, and even create child pornography, even when those acts occur on a military installation.

Actual Children

In explaining the elements of each of the four child pornography specifications, the military judge defined "child

---

[37] See, e.g., Espionage Act of 1900, 18 U.S.C. § 792-99 (2000).

[38] 535 U.S. 234 (2002).

18

pornography" by reading § 2256(8) to Appellant, including the impermissibly overbroad language "appears to be" and "conveys the impression."  The stipulation of fact, however, explicitly recognizes that the children in all sixty-four images appended to the stipulation are actual children: "Rather than focusing on a technical listing of the elements of an offense, this Court looks at the context of the entire record to determine whether an accused is aware of the elements, either explicitly or inferentially."[39]

Appellant assured the military judge that he understood the stipulation and that everything in it was true.  After the defense waived objection, the military judge admitted the document, which provided, in part:  "[t]he identity of these children, as well as any lasting damage that may have occurred because of their abuse in these photographs, is not known"; and "[t]he accused never attempted to discover the identities or well-being of these children."

Virtual children do not have "identities," they do not suffer "damage" when abused, nor may their "well-being" be restored.  Appellant knowingly and voluntarily stipulated as fact that the children in the sixty-four images were real, potentially identifiable, female children, some of whom were

---

[39] United States v. Redlinski, 58 M.J. 117, 119 (C.A.A.F. 2003)(citation omitted).

prepubescent, and all of whom were abused.  Appellant's understanding of the animate, corporeal nature of the children depicted in the sixty-four images attached to the record of trial is clear.  Moreover, the sixty-four images attached to the record in this case graphically support Appellant's belief that the images are of actual minors.[40]  There is no substantial basis in law and fact to question the providence of Appellant's plea.  Appellant was aware of the elements and the facts objectively support his plea.

### The "Specialized Society" Revisited

By departing from the bulk of federal precedent, without articulating any military necessity or distinction, this Court continues to suggest that servicemembers accused of child pornography offenses have First Amendment and trial rights paramount to those extended by the federal circuits to similarly situated civilian defendants prosecuted under the same statute.  Further, without even articulating a balance, the majority implicitly promotes the newly elevated rights for accused military child pornographers over those of the military community as a whole.

---

[40] See, e.g., images 58, 59, 60, and 63 (attached to the stipulation of fact).  These images unquestionably depict actual female children of kindergarten age in graphic sexual poses.

A.   Application of Free Speech Coalition in the Federal Courts

Since Free Speech Coalition, most of the federal courts that have considered cases in which the constitutionally overbroad language of § 2256(8) was employed have looked to the entire record to determine the legal impact of constitutionally impermissible instructions or explanations.  Even in contested cases, these courts have found sufficient evidence that images depicted actual children in cases where a pediatric expert testified as to the age of the child depicted and "the photographs appeared to portray real children."  See, e.g., United States v. Bender, 290 F.3d 1279, 1282 (11th Cir. 2002)(denying defendants' free speech claim and noting that "there [was] sufficient evidence that the images portray[ed] real children").  Courts have upheld convictions when the appellate judges' own viewings left no doubt that "the images shown to the jury . . . depicted . . . real" children.  United States v. Richardson, 304 F.3d 1061, 1064 (11th Cir. 2002).  The Richardson court "reached [that] conclusion because the evidence clearly established that the children depicted in the images or pictures were actual children."  Id. at 1064-65.  In that case, a special agent testified that, based on his training and experience, the images depicted actual children and not what simply appeared to be children.

United States v. Martinelli, No. 02-0623/AR

Other federal courts addressing this issue have upheld convictions where the factfinder concluded that the images depicted actual children or where the appellate court deemed that it must have been so.  Padgett v. United States, 302 F. Supp. 2d 593, 598-600 (D.S.C. 2004)(finding that language of providence inquiry established actual nature of children and that, by appellate court's own review, photos were of actual children);  United States v. Slanina, 359 F.3d 356, 357 (5th Cir. 2004) (stating that the "Government was not required to present any additional evidence or expert testimony . . . to show that the images downloaded . . . depicted real children, and not virtual children");  United States v. Farrelly, 389 F.3d. 649, 655 (6th Cir. 2004)(affirming conviction where the Government presented "sufficient evidence of actual children" and the trier of fact 'was capable of reviewing the evidence to determine whether the Government met its burden to show that the images depicted real children'") (quoting Slanina, 359 F.3d at 357);[41]  United States v. Kelly, 314 F.3d 908, 912 (7th Cir. 2003)(upholding a guilty plea "[b]ecause regulation of real child pornography remains constitutional . . . and Mr. Kelly

---

[41] See, e.g., 3 Leonard B. Sand et al., Modern Federal Jury Instructions -- Criminal, Inst. 62-22 (2005) ("You may consider all of the evidence, including your viewing of the depiction, in determining whether the depiction portrayed an actual person under the age of eighteen engaging in sexually explicit conduct.").

possessed real child pornography"); United States v. Deaton, 328 F.3d 454, 455 (8th Cir. 2003)(reaffirming the reasonableness of a "jury's conclusion that real children were depicted, even where the images themselves were the only evidence the government presented on the subject."); United States v. Vig, 167 F.3d 443, 449 (8th Cir. 1999)(holding that the "images were viewed by the jury which was in a position to draw its own independent conclusion as to whether real children were depicted."); United States v. Reardon, 349 F.3d 608, 612-14 (9th Cir. 2003)(evidence at trial sufficient to prove real children); United States v. Kimler, 335 F.3d 1132, 1142 (10th Cir. 2003)(stating that factfinders are "still capable of distinguishing between real and virtual images"); United States v. Hall, 312 F.3d 1250, 1260 (11th Cir. 2002)(affirming a Free Speech Coalition conviction because "no reasonable jury could have found that the images were virtual children"). But see United States v. Hilton, 386 F.3d 13, 18-19 (1st Cir. 2004)(because the jury was not required to find that the images were of actual children, even if a commonsense determination would compel such a finding, the conviction could not stand).[42]

---

[42] See also United States v. Maxwell 49 F.App'x 410, 411 (4th Cir. 2002)(affirming pre-Free Speech Coalition guilty plea on the basis that pornography was of actual children); United States v. Roberts, 84 F.App'x 440, 441 (5th Cir. 2004)(denying attack on pre-Free Speech Coalition conviction on ground that detailed testimonial description of pictures established their

Thus, it is clear that the great weight of federal authority supports the analysis and conclusions of the Army Court of Criminal Appeals.

   B.   Treatment of Free Speech Coalition in this Court

   This case revisits a familiar question:  how is this Court to ensure compliance with Free Speech Coalition when, during the course of court-martial proceedings, the military judge employed the statutory language found by Free Speech Coalition to be overbroad -- language that could ostensibly permit conviction based on visual depictions of virtual children?  In this case, that question is narrowed to the context of a Care inquiry.

   The answer, of course, begins with our duty to follow the decisions of our superior court.  But when we impose upon the Government a greater burden than the Supreme Court requires, we must first articulate a balance between the First Amendment and trial rights of a military accused, on the one hand, and the military community's interest in good order and discipline on the other.  Both the servicemember and the military community share an interest in a lawful, rational application of the CPPA. Unfortunately, while maintaining a position that affords military child pornographers a level of sanctuary unrecognized

---

actual nature).

by other jurisdictions, the majority provides no balancing and serves only one interest.

As noted above, a growing majority of federal courts have declined an overly restrictive application of Free Speech Coalition, in favor of a measured approach, e.g., consideration of waiver, United States v. Hay, 231 F.3d 630, 639 (9th Cir. 2000), plain error, Hall, 312 F.3d at 1259, and other legal theories, in conjunction with an examination of the facts of each case, including the nature and characteristics of the prohibited images themselves. Richardson, 304 F.3d at 1064.

The majority has rejected that approach and has essentially established a per se reversal rule to be applied to any case in which the unconstitutionally overbroad language is used, unless the conviction can be upheld under clauses 1 and 2 of Article 134. The application of that rule in this case operates to exonerate an accused who clearly admitted to trafficking in pornographic images of actual early teen, preteen, and kindergarten girls.

C. Balancing –- Now and in Future Cases

The approach this Court should take in Appellant's case need not be inconsistent with the Court's holding in O'Connor:

> For present purposes, however, a provident guilty plea
> to a violation of the CPPA provision at issue here
> must reflect that an accused has violated those
> portions of the statute upheld by the Supreme Court.
> In light of that, and in the absence of any discussion

25

or focus in the record before us regarding the "actual" character of the images, we cannot view Appellant's plea of guilty to violations of the CPPA as provident.

. . . .

We have long recognized that the First Amendment rights of civilians and members of the armed forces are not necessarily coextensive. At the same time, however, we must ensure that the connection between any conduct protected by the First Amendment and its effect on the military environment be closely examined.

58 M.J. at 454-455 (citations omitted).

This Court's disposition of Appellant's case should, at a minimum, treat those very same considerations addressed by O'Connor: evaluating any "discussion or focus in the record before us regarding the 'actual' character of the images," and ensuring "that the connection between any conduct protected by the First Amendment and its effect in the military environment [is] closely examined." Id. Instead, without explanation or elaboration, the majority purports to rely on O'Connor, while conducting no balancing and implicitly declining to adopt the reasoning of the clear majority of Article III courts.

As a matter of general practice, when we choose to depart from Supreme Court precedent, or from the reasoning of the majority of the federal circuit courts that have followed Supreme Court precedent in construing and applying a constitutional or statutory provision, and when that departure

is not required by legislative or executive mandate, this Court should articulate the military necessity or distinction that compels our reasoning. See, e.g., United States v. Roberts, 59 M.J. 323, 327 (C.A.A.F. 2004) (rejecting Supreme Court standard for evaluating discovery violation and applying a more stringent standard based on "military practice"); United States v. Unrue, 22 C.M.A. 466, 469, 47 C.M.R. 556, 559 (C.M.A. 1973)(recognizing "military necessity" in evaluating reasonableness of search and seizure); United States v. Wiesen, 57 M.J. 48, 50 (C.A.A.F. 2002)(declining to view court member challenge "through the prism of the Sixth Amendment"); United States v. Moore, 58 M.J. 466, 469 (C.A.A.F. 2003)(applying "good order and discipline" rationale in validating Government's abrogation of First Amendment free speech rights); United States v. Brown, 45 M.J. 389, 395 (C.A.A.F. 1996)(applying "clear danger to loyalty, discipline, mission, or morale" standard to First Amendment claim).

"This Court has long recognized that the military is, by necessity, a specialized society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history." Parker v. Levy, 417 U.S. 733, 743 (1974). Balancing this recognition of the military's specialized need for enhanced discipline and regulation, our Court has long maintained vigilance in

preserving the rights of servicemembers in the court-martial process.  See generally United States v. Jacoby, 11 C.M.A. 428, 29 C.M.R. 244 (1960).  When we perform this balancing, however, we must not fail to consider the fabric of the "specialized society" in which servicemembers and their families exist.  The Department of Defense and the military departments have emphasized that this "specialized society" consists not only of servicemembers, but of their families as well.[43]

When this Court applies a U.S. Code provision and our superior court's interpretation thereof in a manner inconsistent with the bulk of Article III courts -- presumably for the purpose of providing an elevated level of protection for the trial rights of a military accused -- we must weigh the reasons for our divergent application of that statute against the concomitant reduction in the level of protection that statute would otherwise provide to the "specialized society" we also serve.  As noted, that society is populated not only by the uniformed men and women who bravely serve our Nation, but by their spouses and children, all of whom have every right to

---

[43] See, e.g., Department of Defense (DoD) Directive, Family Policy, at E3.1.1 (Dec. 30, 1988) ("DoD personnel and their families are the most valuable resource in support of the national defense.  DoD Families serve as a force multiplier, contributing to the readiness and retention of quality personnel.  The goal is a combat-ready force supported by families whose quality of life reflects the high standards and pride of the Nation they defend.").

expect a measured and rational application of law by trial and appellate courts.  More particularly, in light of this Court's historical balance between individual First Amendment rights and the needs of the "specialized society," the members of that society could hardly anticipate that this Court would, despite the weight of federal decisions to the contrary, construe a Supreme Court decision so as to elevate the right of an individual servicemember to traffic in child pornography above the need of that "specialized society" for good order and discipline.

How then, without being compelled to do so by our superior court, by Congress, or by the President, does this Court elevate the First Amendment and fair trial rights of servicemembers over the military's need for good order and discipline?  Are good order and discipline, as well as the safety and security of the community not threatened by the creation and proliferation of child pornography within that community?  This Court's application of Free Speech Coalition not only places us in the minority of federal fora, but, for reasons that remain a mystery, confers on servicemembers accused of owning, distributing, and trafficking in child pornography a status that exalts their constitutional rights above those of civilians accused of identical crimes, while unnecessarily and unintentionally denigrating the legitimate interests of the

thousands of other servicemembers and their families who comprise the "specialized society" recognized by the Supreme Court for over thirty years.

IV. Conclusion

Both on the question of extraterritorial application of § 2252A and on implementation of Free Speech Coalition, the majority moves this Court still further from the mainstream of federal practice. In doing so, the lead opinion departs from our own precedent by failing to conduct a balancing of competing rights and interests. For these reasons alone, I must respectfully dissent. Because Appellant's stipulation of fact provides no "substantial basis in law and fact to question the providence of," United States v. Prater, 32 M.J. 433 (C.M.A. 1991), Appellant's pleas to possession and trafficking in child pornography, because the images in question clearly depict actual minors, and because Appellant waived the issue,[44] I must also respectfully dissent. Finally, I respectfully dissent from the majority's declination to find both that specifications 1, 2, and 3 were not committed within the territory of the United States and that Appellant's pleas provident to the lesser

---

[44] O'Connor, 58 M.J. at 455-57 (Crawford, C.J., dissenting).

included offense of conduct prejudicial to good order and

discipline or to bring discredit upon the armed forces.[45]

---

[45] <u>Id.</u> at 457-59.